UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

    -against-                                                1:12-MC-65 LAK/CFH

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Randy M. Mastro
Howard S. Hogan
GIBSON, DUNN & CRUTCHER, LLP

Paul DerOhannesian, II
DEROHANNESIAN & DEROHANNESIAN

*Attorneys for Plaintiff Chevron Corporation*

John W. Keker
Jan Nielsen Little
Matthew M. Werdegar
KEKER & VAN NEST, LLP

Craig Smyser
Larry R. Veselka
SMYSER KAPLAN & VESELKA, L.L.P.

Justin W. Gray
MAYNARD, O'CONNOR, SMITH
& CATALINOTTO LLP

Marcia C. Hofmann
ELECTRONIC FRONTIER FOUNDATION

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC

Craig Smyser
Larry R. Veselka
Tyler G. Doyle
SMYSER KAPLAN & VESELKA, L.L.P.

*Attorneys for Defendants Steven Donziger, The Law Offices of Steven Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*

LEWIS A. KAPLAN, *District Judge*.[*]

In 2011, an Ecuadorian court entered an $18.2 billion judgment (the "Judgment") against Chevron Corporation ("Chevron").[1] At about the same time, Chevron brought this action against the Ecuadorian plaintiffs (referred to as the Lago Agrio plaintiffs or "LAPs") and others in the Southern District of New York (collectively, the "defendants").[2] Chevron there alleges among other things that the Judgment is the product of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The RICO and, to some extent, the fraud claims rest on allegations that Steven Donziger, a New York lawyer for the Ecuadorian plaintiffs, and others based in the United States here conceived, substantially executed, largely funded, and significantly directed a scheme to extort[3] and defraud Chevron by, among other things, (1) bringing the Lago Agrio case;[4] (2) fabricating (principally in the United States) evidence for use in that lawsuit and corrupting and intimidating the Ecuadorian judiciary in order to obtain a tainted judgment;[5] (3)

---

[*] Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, sitting by designation.

[1] 11 Civ. 0691, DI 168 (Lago Agrio Judgment).

[2] *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK).

[3] Amended complaint ("Cpt.") ¶ 1 (alleging that defendants "sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

[4] *Id.* ¶ 3.

[5] *E.g., id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report [the report of a supposedly independent, court-appointed expert]."); *id.* ¶

exerting pressure on Chevron to coerce it to pay money not only by means of the Lago Agrio litigation and judgment, but also by forcing it to defend against public attacks in the United States and elsewhere based on false and misleading statements;[6] (4) inducing U.S. public officials to investigate Chevron;[7] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[8]

In connection with the Southern District action, Chevron served a subpoena issued by this Court on Microsoft Corporation ("Microsoft"). The subpoena seeks information relating to thirty email addresses. The matter is before this Court on motions by three John Does, who claim to own three of the email addresses covered by the subpoena, and the defendants to quash the subpoena.

*Facts*

The email addresses listed in the subpoena belong to non-parties who allegedly were involved directly or indirectly in the Ecuadorian litigation. The subpoena calls for the production of all documents related to (1) the identity of the users of the email addresses, including "all names, mailing addresses, phone numbers, billing information, date of account creation, account

---

151 ("While Stratus [LAP environmental consultant] was the primary coordinator of the . . . Cabrera Report, other members of the [LAP's] U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353–56; Mastro Decl. [DI 746] Ex. C (hereinafter "Guerra Decl.").

[6] Cpt. ¶ 214.

[7] *Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.

[8] *Id.* ¶¶ 273-77, 291-300, 311-16.

4

information and all other identifying information," and (2) the usage of the email addresses, including "IP logs, IP address information at the time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address."[9] The time period covered by the request is 2003 through September 2012.[10]

In simpler terms, Chevron is requesting that Microsoft produce documents identifying the account holders and their available personal information. Chevron seeks also the IP address associated with the creation of each account and the IP address connected with every subsequent login to each account over a nine-year period. The subpoena does *not* call for the contents of any emails sent or received by any of the thirty email addresses.

To understand the nature of the subpoenaed information, some background on Internet protocols is necessary. "An Internet Protocol address (or 'IP address') is a numeric value used to identify the network location of a computer or set of computers on the Internet. Every computer on the Internet needs to have an IP address in order to communicate with other computers on the internet."[11] "IP addresses are allocated to Internet Service Providers (ISPs) in blocks of consecutive addresses out of a worldwide pool . . . . ISPs can further delegate these addresses to smaller entities such as businesses, Internet cafes, or smaller ISPs. ISPs can also assign an IP

---

[9] Marx Decl. [DI 38] Ex. 2.

[10] *Id.*

[11] Schoen Decl. [DI 2-3] at ¶ 3. The Does submitted with their motion a declaration of Seth Schoen, a Senior Staff Technologist with the Electronic Frontier Foundation in San Francisco, California.

5

address directly to an individual computer."[12]  "Individual users connect [to the Internet] using different IP addresses depending on where they are."[13]  "An IP address may identify the network through which a network-enabled device (such as a desktop computer, laptop computer, tablet, or smartphone) is accessing the Internet.  When a portable device moves from an Internet connection on one network (the network connection at one's home, for example) to an Internet connection on another network (a local coffee shop), the IP address associated with the portable device changes to reflect that the device is connected to that particular network."[14]

"Many host computers of websites, including popular web-based email services like . . . Microsoft Hotmail, maintain logs that list the IP address of visitors along with the date and time information.  Websites that utilize a log-in feature typically maintain a log of IP addresses and other data associated with the particular user who logged in, such as the date and time of log-in and the duration of time the user visited the website."[15]

Through online services, "[a] user can input a numerical IP address and obtain the registry's information about the assignee of that IP address, which might be an ISP or other entity.  When IP addresses have been allocated directly to an organization that makes use of them [the online services] can sometimes associate an IP address with an exact physical location. . . . On most occasions, however, [the service] will only associate an IP address with an Internet service

---

[12] *Id.* at ¶ 4.

[13] *Id.* at ¶ 6.

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 8.

provider's office, which is often in the same region as its subscribers or users but does not reveal their exact locations."[16] These online services and other sources provide supplementary information about the geographic location "where ISP's operate and where they use particular ranges of IP addresses. . . . For instance, the IP address 199.83.220.233 is easily traceable to San Francisco . . . ."[17] Where specific information about the physical location of an IP address is lacking, a litigant who possesses a list of IP addresses "can subpoena subscriber information from the corresponding ISP's for the specific IP addresses and develop a detailed picture of a person's location and movements from that subscriber information."[18]

To summarize, if Microsoft still has and were to produce the requested information, Chevron would learn the IP address associated with every login for every account over a nine-year period. Chevron could identify the countries, states, or even cities where the users logged into the accounts, and perhaps, in some instances, could determine the actual building addresses.

Chevron would not learn who logged into the accounts. That is to say that Chevron would know who created (or purported to create) the email accounts but would not know if there was a single user or multiple users for each account. Nevertheless, the subpoenaed information might allow Chevron to infer the movements of the users over the relevant period (at a high level of generality) and might permit Chevron to make inferences about some of the users' professional and personal relationships.

---

[16] *Id.* at ¶ 11.
[17] *Id.* at ¶ 12.
[18] *Id.* at ¶ 13.

7

The Southern District defendants and the Does seek to prevent Chevron from gaining access to this information. Two of the Does submitted declarations explaining that they are the owners of the email accounts Simeontegel@hotmail.com and Pirancha@hotmail.com and that they were involved in certain press-related activities in connection with the Lago Agrio litigation and its associated environmental advocacy campaign in Ecuador.[19] They are proceeding as "Does" on the theory that this protects their anonymity.[20]

In reality, Chevron believes that it knows who owns the email addresses of the Does and many others. For example, in its opposition to the Does' motion to quash, it explains that "Simeontegel@hotmail.com is apparently an email account of Simeon Tegel, who was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme."[21] This description of Simeon Tegel is largely consistent with the declaration submitted by the owner of Simeontegel@hotmail.com.

It is relevant also that the Does have submitted no evidence that they are U.S. citizens or otherwise have a strong connection to this country.

---

[19] DI 45, Exs. A, B.

[20] The Does each submitted declarations in connection with the motion to quash. They signed these declarations with their email addresses. The Court ordered the Does to sign their declarations in their own name and to resubmit them under seal. The Court has not shared this information with Chevron and the Does continue to proceed anonymously.

[21] DI 35 at 5.

8

*Parties' Arguments*

The Does have moved to quash the subpoena primarily on the grounds that disclosure of the subpoenaed information would violate their First Amendment rights to (1) anonymous speech and (2) association.[22] They argue also that they are entitled to represent the interests of the twenty-seven non-appearing email address owners.[23] The defendants have moved to quash, among other reasons, on privilege grounds.[24]

Chevron responds that production of the subpoenaed information would not violate any First Amendment rights,[25] that the Does lack standing to move to quash with respect to email accounts other than their own,[26] that the defendants in the Southern District action do not have standing to move to quash, and that the disclosure would not reveal privileged information.[27] Chevron claims also that this information will assist it in prosecuting its claims in the Southern District case.[28] For example, the locations of the logins may help Chevron determine what actions

---

[22] DI 2-1.

[23] DI 42 at 1–4.

[24] DI 1 at 6–7.

[25] DI 35 at 13–23.

[26] *Id.* at 7–8.

[27] DI 36 at 6–7, 14–15.

[28] DI 35 at 10–11.

were taken in furtherance of the alleged conspiracy in the United States, which is relevant to counter the defendants' argument that Chevron is urging an improper extraterritorial application of RICO.[29]

*Discussion*

*Does' Motion to Quash*

The Does' First Amendment argument fails because they have not shown any entitlement to First Amendment protection. In any case, they lack standing to move to quash the subpoena on First Amendment grounds.

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, or . . . the right of the people peaceably to assemble." The Supreme Court has noted that a textual analysis of the Constitution "suggests that 'the people' protected by the [First Amendment], refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[30] Indeed, as early as 1904, the Supreme Court held that the First Amendment's guarantees of freedom of speech and assembly do not apply to an excludable alien because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law."[31] Much more recently, the D.C. Circuit relied on this principle in affirming a district court's determination "that the interests in free speech

---

[29] *Id.* at 11.

[30] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (analyzing the extraterritorial application of the Fourth Amendment).

[31] *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).

and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment."[32]

In the related context of the Establishment Clause of the First Amendment, the Second Circuit upheld a U.S. taxpayer challenge to government funding of foreign religious schools on the ground that the Establishment Clause prohibited taxation for religious purposes, no matter where the money was spent.[33] In so holding, however, the Circuit court noted that it could "think of no theory under which aliens would have standing to challenge either a grant [of government aid] or a denial of aid [under the Establishment Clause of the First Amendment]."[34]

In light of these principles, and in the absence of evidence that the Does are "people to whom these things are secured by our Constitution," they do not have standing to move to quash the subpoenas on First Amendment grounds either on their own behalf or on behalf of the non-appearing owners' whose account information has been subpoenaed.

The Does nevertheless argue that they have standing to assert the positions of the owners of the twenty-seven accounts other than their own on the theory that "practical obstacles prevent [them] from asserting [First Amendment] rights on behalf of" themselves.[35] But there is neither evidence nor reason to believe that the owners of the other twenty-seven accounts would face

---

[32] *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 283–85 (D.C. Cir. 1989).

[33] *Lamont v. Woods*, 948 F.2d 825, 839 (2d Cir. 1991).

[34] *Id.* at 840.

[35] DI 42 at 2 (quoting *Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)).

11

any practical difficulties in protecting their own interests if they were so minded. Indeed, owners of at least some of these accounts have opposed these subpoenas in the Southern District of New York and the Northern District of California.[36]

*Defendants' Motion to Quash*

A litigant's standing to object to nonparty witness subpoenas generally is limited to the assertion of claims of personal rights or privilege.[37] The Southern District defendants do not profess to own any of the email addresses and thus assert no personal rights. They do claim that disclosure of the account information and IP logs improperly would reveal privileged information related to the LAPs' legal strategy.[38] This argument fails for two reasons. First, the defendants have not identified any communications or material prepared in anticipation of litigation that would be revealed if Microsoft were to release the subpoenaed information. Second, the defendants have not provided any competent evidence indicating that the email addresses belong to any of the LAPs' lawyers or the LAPs themselves.

\* \* \*

---

[36] *See, e.g., Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK) (S.D.N.Y.), DI 591, 592, 588; *Chevron Corp. v. Salazar*, 11-mc-80217-CRB (N.D. Cal.), DI 23.

[37] *Chevron Corp. v. Aguinda Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2207555, at \*2 n.11 (Jun. 2, 2011) (citing *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975)).

[38] DI 1 at 6–7.

12

The Court has considered the movants' remaining arguments and finds them to be without merit.[39]

*Conclusion*

For the foregoing reasons, the motions to quash Chevron's subpoena to Microsoft [DI 1, 2] are denied.

SO ORDERED.

Dated: June 25, 2013

_____
Lewis A. Kaplan
United States District Judge

---

[39] The most forcefully argued of the movants' remaining arguments is that the subpoena is over-broad. The Court is not persuaded. Most of what Chevron could learn from the subpoenaed IP logs about the Does' movements would be only at a high level of generality. The subpoena requests account activity information only from the period of the alleged fraud. That the Does claim to have been involved in that alleged fraud for limited periods of time does not mean that Chevron is not entitled to subpoena information that may prove otherwise and be relevant to its case.