# 13-3573-cv

### In the United States Court of Appeals for the Second Circuit

IN RE AUTOHOP LITIGATION

_____

DISH NETWORK L.L.C.,

*Plaintiff-Consolidated Defendant-Counter-Defendant-Appellee,*

v.

AMERICAN BROADCASTING COMPANIES, INC., ABC, INC.,
DISNEY ENTERPRISES, INC.,

*Defendants-Counter-Claimants-Appellants,*

(Caption Continued on Inside Cover)

On Appeal from the U.S. District Court for the Southern District of New York

## BRIEF *AMICUS CURIAE* OF INTELLECTUAL PROPERTY SCHOLARS

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR 97204
(503) 802-2021

(Caption Continued from Outside Cover)

THE FOX ENTERTAINMENT GROUP, INC., FOX TELEVISION HOLDINGS, INC.,
FOX CABLE NETWORK SERVICES, L.L.C.

*Defendants,*

CBS CORPORATION, NBC UNIVERSAL MEDIA, L.L.C.
SURVIVOR PRODUCTIONS LLC, CBS STUDIOS, INC.

*Defendant-Counter-Claimants,*

CBS BROADCASTING, INC.,

*Counter-Claimant,*

ECHOSTAR TECHNOLOGIES, L.L.C.,

*Counter-Defendant.*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................. 1

INTRODUCTION ................................................................ 1

ARGUMENT ...................................................................... 3

   I.  The Court Should Reject Appellants' Attempt to Restrict the Supreme Court's Holding in *Sony* to the Technology Available in 1979. ........................................................ 3

  II.  The Court Should Reject the Appellants' Arguments that Use of AutoHop and PTAT are Commercial Uses that Will Create Market Harm and Therefore Not Fair Use. .............. 5

     A.  The Purpose and Character of the Use is Noncommercial. . 7

     B.  PTAT and AutoHop have no adverse Effect on the Potential Market for the Copyrighted Work. ..................... 9

   CONCLUSION ................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006) .............................................................3, 10, 13

*Fox Broad Co. v. Dish Network, LLC,*
(9th Cir. 2013) ...................................................................................7

*Maxtone-Graham v. Burtchaell,*
803, F.2d 1253 (2d Cir. 1986) .....................................................7

*Ringgold v. Black Entertainment Television, Inc.,*
126 F.3d 70 (2nd Cir. 1997) ..........................................................15

*Sega v. Accolade,*
977 F.2d 1510 (9th Cir. 1992) ......................................................13

*Sony Corp. of America v. Universal City Studios, Inc.,*
464 U.S. 417 (1984) ...............................................................passim

STATUTES

17 U.S.C. §107 ..................................................................................5, 6

## STATEMENT OF INTEREST[1]

*Amici* are law professors and scholars who teach, research and write in the area of intellectual property and technology. *Amici* have an interest in this case because of their interest in the sound development of copyright law and because of this case's potential impact on copyright fair use principles relating to technology that enables noncommercial time-shifting. Resolution of the fair use issues presented in this case has far-reaching implications for the scope of copyright protection, a subject relevant to *Amici's* professional interests and one about which they have great expertise. A complete list of individual *Amici* is attached as Exhibit A.

*Amici* respectfully submit this brief with the consent of all parties. Fed. R. App. P. 29(a).

## INTRODUCTION

The outcome of this case will affect the future of private noncommercial time-shifting of television programs – a fair use right expressly recognized by the Supreme Court in *Sony Corp. of*

---

[1] Pursuant to Rule 29(c)(5), *amici* state that no party's counsel authored the brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief.

*America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The advancement of technology from the videotape recorder ("VTR") to the videocassette recorder ("VCR") considered in *Sony*, to today's digital video recorder ("DVR") and the technological enhancements of the DVR has not – nor should it – affect the scope of protection expressly recognized in *Sony*. Nonetheless, American Broadcasting Company, Inc., ABC, Inc., and Disney Enterprises Inc. ("ABC"), allege their claims are not about private noncommercial time-shifting of television programs and therefore outside of the scope of *Sony*. However, Appellants' legal arguments are to the contrary.  ABC advances several arguments, which are nothing more than thinly veiled attempts to overrule *Sony* and disrupt sound and settled principles of copyright fair use.

The use of AutoHop and PrimeTime Anytime ("PTAT") is as much a fair use as the use of the original Betamax technology. Both are enhanced features available to users of DISH Network's DVR (the "Hopper"), which enables private noncommercial time-shifting of legally acquired television programs.  The licensing of time-shifted programs to Internet

2

websites Hulu, iTunes and Video-on-Demand ("VOD") by ABC is of no consequence to a fair-use market analysis. As this Court stated: "[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing [fair uses]." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006) (quotations omitted). To allow this would be to take settled fair uses and turn them into infringements over time at the copyright holder's discretion.

Amici respectfully file this brief out of concern that adoption of ABC's interpretation of copyright law would undermine longstanding fair use precedent. We urge the Court to reject ABC's attempt to render *Sony* obsolete and re-litigate the public's interest in making fair use copies with the aid of time-shifting technology.

## ARGUMENT

## I.  The Court Should Reject Appellants' Attempt to Restrict the Supreme Court's Holding in *Sony* to the Technology Available in 1979.

Appellants seek to disguise their attack on bedrock copyright principles by maintaining that their position is not at odds with the holding in *Sony*.  Indeed, Appellants argue that

*Sony's* time-shifting rule does not apply to the Hopper's PTAT and AutoHop features because the technology is fundamentally different from that available in 1979. ABC does its best to characterize the technology at issue, the Hopper and its features (AutoHop and PTAT), to be outside the scope of protections granted by the Supreme Court in *Sony*. ABC attempts to avoid clear Supreme Court precedent by confining the definition of time-shifting to include only a single recording. ABC Br 57 (citing *Sony*, 464 U.S. at 423). While the technology of the Hopper is more advanced and convenient to use than that of the VCR of the 1970s, there is no legal distinction between the functionality of the technologies. The VCR and the Hopper do essentially the same thing which is allow the consumer to record a live television program so the viewer can watch the program at a more convenient time—a fair use according to the Supreme Court in *Sony*. A strained construction of the definition of "time-shifting" or the applicable technology is not appropriate in determining fair use in the context of technology that allows recording of live television programing. Indeed, a full reading of

the Supreme Court's opinion in *Sony* confirms that fair use and time-shifting was not limited to the then current technology. *Sony*, 464 U.S. at 448 n. 31 ("'[Section 107] endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change.'")(quoting H.R. Rep. No 94-1476, p 65-66 (1976) U.S. Code Cong. & Admin. News 1976, p. 5680)).

To rule that use of the Hopper's AutoHop and PTAT are violative of ABC's copyrights essentially reverses *Sony* and its progeny rendering most, if not all, forms of private time-shifting/place-shifting unlawful.

## II. The Court Should Reject the Appellants' Arguments that Use of AutoHop and PTAT are Commercial Uses that Will Create Market Harm and Therefore Not Fair Use.

To controvert the district's court's finding of fair use, Appellants assert that the district court erred in holding that subscribers' uses of PTAT and AutoHop are noncommercial and failing to address the "market harm" factor in its fair use analysis. ABC Br.29-30. ABC's assignments of error are not

5

borne out in the record, the district court's opinion or settled legal principles governing copyright fair use, and this Court should summarily reject these arguments and uphold the district court's ruling which was based upon sound analysis of copyright principles.

Section 107 of the Copyright Act identifies four factors to be considered when determining whether a particular unauthorized use qualifies as a fair use under the Copyright Act: (1) the purpose and character of the use, including whether such use is of a commercial nature; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. §107. The district court correctly found consistent with *Sony*, the Second Circuit and sister circuit precedent that the use in question is fair use pursuant to section 107 of the Copyright Act.

6

## A. The Purpose and Character of the Use is Noncommercial.

The initial inquiry in the fair use analysis is the purpose and character of the use. The character of the use of the copies created by users of DISH's PTAT and AutoHop are identical to the use of the Sony Betamax—private, time-shifting for in-home viewing. *Sony*, 464 U.S. at 442. As Judge Gee observed in *Fox Broad v. Dish Network*, this is a modern version of *Sony*, "fast-forward[ed]" to keep pace with current technology. *Fox*, 2012 *WL* 5938563 *1. However, ABC contends that the copies made by users of the Hopper are commercial because the users avoided paying a fee through a licensing arrangement for time-shifting the copyrighted work. This avoidance of a fee, Appellants argues, constitutes a commercial use. ABC Br. 51-52. Appellants' argument is without merit for two reasons. First, courts have consistently held that exploitation of copyrighted material for private home enjoyment is a noncommercial, nonprofit activity. *See Maxtone-Graham v. Burtchaell*, 803, F.2d 1253 (2d Cir. 1986); *Fox Broad Co. v. Dish Network, LLC*, (9th Cir. 2013). Citing *Texaco,* 60 F.3d at 922, ABC suggests that the

7

threshold question to determine whether a particular use is commercial is "the value obtained by the secondary user from the use of the copyrighted material." ABC inexplicably seeks to establish a value received by the subscriber for advanced technology. There is no evidence that subscribers of DISH use the PTAT and AutoHop technologies any differently from that of the VCR or the DVR—a use that has consistently been held noncommercial.

Secondly, Appellants' argument is without merit because the underlying work is broadcasted to the public free of charge and recording the program for later viewing "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony,* 464 U.S. at 449. Indeed, time-shifting in this context has been deemed to "yield societal benefits" *Sony*, 464 U.S. at 454, and such benefits are noncommercial in the fair use analysis. It cannot be disputed that just like the VCRs in *Sony*, the PTAT copies and the uses of AutoHop are made by DISH subscribers in the privacy of the consumer's home; they reside on the consumer's Hopper; the

copies are incapable of being distributed, sold or exploited in any way other than for the consumer. The district court correctly found that the "improved efficiency of home recording through the PTAT and Hopper technologies does not alter the noncommercial nature and the purpose of the recording."

### B. PTAT and AutoHop have no adverse Effect on the Potential Market for the Copyrighted Work.

The fourth factor to consider in the fair use analysis is the effect of the use on the potential market for or value of the copyrighted work. ABC's analysis of this factor is simplistic, formulaic and based on the circular notion that because a market exists for the right to license copies of its programs for time-shifting, the DISH subscribers' copies harm ABC's opportunity to negotiate a value for all uses of those copies. ABC Br 64-68. Through its arguments, ABC asks this Court to ignore the purpose of fair use: permitting the unlicensed copying of materials. ABC invites the Court to consider the existence of a potential licensing market as countering a finding of fair use. This argument is a circular one of the kind rejected by this Court as impermissible in

the fair use analysis. It is a well-settled copyright principle, acknowledged by this Court that "a copyright holder cannot prevent others from entering fair use markets by merely developing or licensing a market for parody, news reporting, education or other transformative uses of its own creative work." *Bill Graham Archives*, 448 F.3d at 614-15 (internal quotations omitted). Notwithstanding, ABC emphatically advances two arguments: (1) that DISH subscribers' PTAT copies harm their opportunity to negotiate a value for time-shifting; and (2) that the PTAT and AutoHop features of the Hopper directly compete with "licensed, on-demand and commercial free offerings." With respect to the Appellants' first argument, any claim of serious market or licensing harm is belied by the fact that users' home use of the Hopper to watch programs is time-shifting—a use which has been considered fair use for nearly three decades. Nevertheless, ABC makes a series of predictions about the harm it will suffer if the copies are found to be fair use. Those predictions are as rife with speculation as they were when they were first made in *Sony*.

Indeed, the copyright holders in *Sony* were similarly concerned that use of the Betamax would pass "invisible boundaries" and that "copyright owner[s] [would lose] control over [their] program[s]." *Sony*, 464 U.S. at 451. As to potential future harm in particular, the copyright holders in *Sony* argued that time-shifting would reduce the number of consumers who watched programs live, would result in the reduction of advertising revenue, would cause a decrease in the amount of rerun viewership, and would damage theater or film rental viewership. *Id.* at 453. The Supreme Court concluded that none of these arguments established a concrete future harm.  *Id.* at 454. Thus, the Supreme Court concluded that the harm from the fair use of time-shifting, whether authorized or unauthorized, was "speculative and, at best, minimal." *Id.* at 454.

In the twenty-eight years since *Sony*, while a falling sky is still the centerpiece of the potential harm claimed by Appellants, the passage of time has not made that prediction any less speculative. ABC's arguments that "Dish's ad-skipping" feature will cause ABC to lose control over its copyrighted works or that

11

AutoHop will impact what advertisers will pay for air time on broadcast networks, or that AutoHop threaten[s] to disrupt ABC's non-television businesses such as Internet streaming, are rank speculation.

Correctly, the district court addressed the speculative nature of ABC's arguments by readily rejecting them. If there is not a demonstrable harmful effect, then there is no reason to prohibit the use.  Such a prohibition "would merely inhibit access to ideas without any countervailing benefit." *Sony*, 464 U.S. at 450–51; *see, also, Perfect 10*, 508 F.3d 1146, 1168 (9th Cir. 2007) (concluding that since the district court had made no finding that downloaded thumbnails were being used on cellphones, market harm to copyright owner selling images for cellphones was hypothetical).

In their second argument for market harm, Appellants advance that the secondary market for time-shifting in a different medium did not exist at the time of the 1984 *Sony* decision and as such, the language of *Sony* suggests that the existence of such a market would have altered the analysis in that case.  ABC's argument is speculative on how the existence of such a secondary

market would have affected the Supreme Court's nearly thirty-year-old precedent. Not only does ABC's argument lack empirical support, it also ignores the benefits of consumer choice and convenience made possible by time-shifting and advanced technologies. Assuming arguendo that a market harm exist, the harm would need to be weighed against the benefits of allowing companies and users to unlock new technologies in assessing the fourth factor in the fair use analysis. The Ninth Circuit clearly articulated market competition goals:

> In any event, an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine.

*Sega v. Accolade*, 977 F.2d 1510, 1536 (9th Cir. 1992).This court formulated this point more succinctly in its *Bill Graham Archives* decision: "[C]opyright owners may not preempt exploitation of transformative markets." *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 614-615 (2nd Cir. 2006). ABC's argument, if accepted, would mean that only copyright owners in television content would be able to develop and market time-

shifting technologies.  This result would not be consistent with the competitive values against which copyright exists.

Furthermore, ABC's argument exhibits a circularity that this Court has rejected after its controversial decision in *Texaco*, 60 F.3d 913, 918 (2d Cir. 1994).   In that case, the majority concluded, using circular reasoning, that the fourth fair use factor did not support a finding of fair use because Texaco could have obtained a license from the Copyright Clearance Center (CCC) to allow its research scientists to make copies of articles published by American Geophysical.  The dissent criticized this reasoning as circular since fair use constitutes an unlicensed use.   The possibility of obtaining a license does not mean that an alleged infringer must obtain one. This reasoning would effectively nullify fair use, since in theory it may always be possible to obtain a license under some negotiated terms. The fair use doctrine, however, presumes that there are some uses of copyright that can be undertaken without the need for a license.

This Court squarely addressed the circularity issue in *Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70 (2nd Cir. 1997), where it wrote:

> We have recognized the danger of circularity in considering whether the loss of potential licensing revenue should weight the fourth factor in favor of a plaintiff. See American Geophysical, at 929 n. 17, 931. Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor. See id. at 931. We have endeavored to avoid the vice of circularity by considering "only traditional, reasonable, or likely to be developed markets" when considering a challenged use upon a potential market. See id. at 930; Nimmer § 13.05[A] [4], at 13–189.

*Id.* at 82; *see, also*, Castle Rock Entmt, Inc. v. Carol Publ'g Grp. Inc., 150 F.3d 132, 145 (2nd Cir. 1998). As the district court correctly concluded here, ABC's claims of market harm are based on speculation. The copyright owner has failed to establish what traditional, reasonable, or likely to be developed markets have been harmed.

To say that a user could have licensed the use in question does not mean that he was legally required to license the use or that he should negotiate a license. This reasoning would eviscerate fair use from the Copyright Act. ABC's

arguments do not take into consideration the role of fair use in protecting consumer uses that enhance the functionality of a copyrighted work by potentially expanding the value to users of expressive and communicative aspects of the work or the long-standing precedent that protects against the arguments it is advancing. Time-shifting through technologies like DISH's Hopper and its added features—PTAT and AutoHop—expand the audience for an expressive work of authorship by permitting users to expand access to the work. Consequently for these reasons, this Court should reject ABC's arguments and uphold the lower court's decision.

## CONCLUSION

Whether a consumer uses a VCR, DVR, or the DISH Hopper with its added features that can record entire primetime schedules of four networks' programs at once, home recording of broadcast television was and remains a protected fair use of copyrighted works. If anything, today's technology keeps consumers from having to make tough decisions about which shows to watch and which to miss, allowing them to record for

16

later viewing as many shows as they want, thereby expanding the audience for television shows.

The fears raised by the copyright holders in *Sony* and echoed by ABC in this case are as unfounded today as they were twenty-eight years ago. The ability to record television shows in one's home for later viewing has not diminished the audience, kept those viewers from being counted in ratings, or decreased revenue. Even with competition from hundreds of other channels and other technologies that vie for consumers, broadcast television is thriving in large part thanks to the viewers' ability to record what they want when they want. *Sony* and its progeny have been a fundamental part of this evolution in television and technology and this Court should affirm their ongoing viability by rejecting ABC's attempt to narrow or eliminate their relevance.

Respectfully submitted,

*/s/ Scott G. Seidman*
Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR  97204
(503) 802-2021

17

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing **BRIEF *AMICUS CURIAE* OF INTELLECTUAL PROPERTY SCHOLARS** is proportionately spaced, has a typeface of 14 points or more, and contains 3,074 words.

Dated: January 24, 2014

*/s/ Scott G. Seidman*
Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR  97204
(503) 802-2021

1

**EXHIBIT A**
**Complete List of Individual *Amici***


Julie Ahrens
Director of Copyright & Fair Use
Center for Internet & Society
Stanford Law School

Timothy K. Armstrong
Associate Dean of Faculty and Professor of Law
University of Cincinnati College of Law

Mark Bartholomew
Professor of Law
SUNY Buffalo Law School

Annemarie Bridy
Alan G. Shepard Professor of Law
University of Idaho College of Law

Dr. Irene Calboli
Professor of Law, Marquette University Law School
Visiting Professor, Faculty of Law, National University of Singapore

Michael A. Carrier
Distinguished Professor
Rutgers Law School

Andrew Chin
Associate Professor
University of North Carolina School of Law

Margaret Chon
Donald & Lynda Horowitz Professor for the Pursuit of Justice
Seattle University School of Law

James Grimmelmann
Professor of Law
University of Maryland
Francis King Carey School of Law

Robert A. Heverly
Associate Professor
Albany Law School of Union University

Dennis S. Karjala
Jack E. Brown Professor of Law
Sandra Day O'Connor College of Law
Arizona State University
Yvette Joy Liebesman
Assistant Professor of Law
Saint Louis University School of Law

Brian Love
Assistant Professor
Santa Clara University School of Law

Stephen McJohn
Professor
Suffolk University Law School

Hiram A. Meléndez-Juarbe
Associate Professor
University of Puerto Rico Law School

Aaron Perzanowski
Associate Professor
Case Western Reserve University
School of Law

Jorge R. Roig
Assistant Professor of Law
Charleston School of Law

Matthew Sag
Professor
Associate Director for
        Intellectual Property of the
        Institute for Consumer Antitrust Studies
Loyola University Chicago School of Law

Jason M. Schultz
Associate Professor of Clinical Law
Director, Technology Law & Policy Clinic
Co-Director, Engelberg Center on Innovation Law and Policy
NYU School of Law

Jessica Silbey
Professor of Law
Suffolk University Law School

Dr. David Tan
Associate Professor
Faculty of Law
National University of Singapore

# CERTIFICATE OF SERVICE

The foregoing **BRIEF *AMICUS CURIAE* OF INTELLECTUAL PROPERTY SCHOLARS** was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system on January 24, 2014.  All participants in the case are registered CM/ECF users.  Service will be accomplished by the appellate CM/ECF system.

Dated: January 24, 2014

*/s/ Scott G. Seidman*
Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, OR  97204
(503) 802-2021

097204/00001/5234337v1