# 13-3573-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

IN RE AUTOHOP LITIGATION

DISH NETWORK L.L.C.,

PLAINTIFFS-CONSOLIDATED DEFENDANT-
COUNTER DEFENDANT-APPELLEE,

V.

AMERICAN BROADCASTING COMPANIES, INC., ABC, INC., AND DISNEY
ENTERPRISES, INC.,

DEFENDANTS-COUNTER CLAIMANTS-APPELLANTS,

(*FOR CONTINUATION OF CAPTION SEE INSIDE COVER*)

On Appeal From The United States District Court
For The Southern District of New York

**BRIEF OF *AMICI CURIAE***
**ELECTRONIC FRONTIER FOUNDATION, PUBLIC KNOWLEDGE, AND**
**ORGANIZATION FOR TRANSFORMATIVE WORKS IN SUPPORT OF**
**APPELLEES AND AFFIRMANCE**

Corynne McSherry
Mitchell Stoltz
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*

January 24, 2013

*On the brief:*

Sherwin Siy
John Bergmayer
PUBLIC KNOWLEDGE
1818N. St. NW, Suite 410
Washington, DC 20036
Tel.: (202) 861-0020
ssiy@publicknowledge.org

*On the brief:*

Rebecca Tushnet
Betsy Rosenblatt
ORGANIZATION FOR
TRANSFORMATIVE WORKS
2576 Broadway, Suite 119
New York, NY 10025
Tel.: (703) 593-6759
rlt26@law.georgetown.edu

THE FOX ENTERTAINMENT GROUP, INC., FOX TELEVISION HOLDINGS, INC., FOX CABLE NETWORK SERVICES, L.L.C.,

DEFENDANTS,

CBS CORPORATION, NBC UNIVERSAL MEDIA, L.L.C., SURVIVOR PRODUCTIONS LLC, CBS STUDIOS INC.

DEFENDANTS-COUNTER-CLAIMANTS,

CBS BROADCASTING INC.,

COUNTER-CLAIMANT,

ECHOSTAR TECHNOLOGIES, L.L.C.,

COUNTER-DEFENDANT.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae Electronic Frontier Foundation, Public Knowledge, and Organization for Transformative Works (collectively, "Amici") state that none of them has a parent corporation and that no publicly held corporation owns 10% or more of the stock of any of them.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................... i

STATEMENT OF INTEREST ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 3

I.   THE DISTRICT COURT'S VOLITIONAL ACT ANALYSIS IS
     CORRECT AND COMPORTS WITH COPYRIGHT'S PURPOSES. ... 4

     A.   The Volitional Conduct Requirement Is Grounded in Statutory and
          Common Law ................................................................... 6

     B.   The Volitional Conduct Requirement Promotes the Progress of
          Science. .................................................................... 10

     C.   The District Court Correctly Applied the Volitional Conduct
          Requirement in Finding that DISH Users Make the PTAT Copies.
          ............................................................................ 13

II.  DISH'S USERS ARE FAIR USERS. ..................................... 16

     A.   Commercial Skipping Is Not A Commercial Use .......................... 16

     B.   Broadcast Works Are Public in Nature. ................................. 18

     C.   Time-Shifting Requires the Whole Work to Be Copied. ............... 20

     D.   There Is No Effect on Any Likely Markets. ............................ 20

III. ANY HARMS THAT ABC ALLEGES ARE QUANTIFIABLE, AND
     DO NOT SUPPORT A PRELIMINARY INJUNCTION ..................... 24

CONCLUSION ...................................................................... 29

## TABLE OF AUTHORITIES

## FEDERAL CASES

*A&M v. Abdallah*,
   948 F. Supp 1449 (C.D. Cal. 1996)........................................................ 10

*Am. Geophysical Union v. Texaco, Inc.*,
   60 F.3d 913 (2d Cir. 1994)................................................................... 22

*Authors Guild, Inc. v. HathiTrust*,
   902 F.Supp.2d 445 (S.D.N.Y. 2012)..................................................... 23

*Baxter v. MCA, Inc.*,
   812 F.2d 421 (9th Cir. 1987)................................................................. 6

*Baylor v. United States*,
   407 A.2d 664 (D.C. 1979)..................................................................... 8

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)................................................................. 23

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.*,
   291 F.3d 1000 (7th Cir. 2002).............................................................. 8

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).............................................................................. 20

*Capitol Records, LLC v. ReDigi*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013).................................................. 15

*Cartoon Network LP, LLP v. CSC Holdings, Inc.*,
   536 F. 3d 121 (2d Cir. 2008).....................................................*passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Group*,
   150 F.3d 132 (2d Cir. 1998)................................................................. 23

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004)......................................................... 7, 8, 10

*Faulkner v. National Geographic Enters.*,
   409 F.3d 26 (2d Cir. 2005)................................................................... 16

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) .................................................................. 25

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .................................................................. 19, 20

*Kalem Co. v. Harper Brothers*,
    222 U.S. 55 (1911) .................................................................. 9

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
    964 F.2d 965 (9th Cir. 1992) .................................................................. 17

*Martinez v. California*,
    444 U.S. 277 (1980) .................................................................. 8

*Office of Commc'n of United Church of Christ v. FCC*,
    359 F.2d 994 (D.C. Cir. 1966) .................................................................. 19

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,
    180 F.3d 1072 (9th Cir. 1999) .................................................................. 17

*Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs., Inc.*,
    907 F. Supp. 1361 (N.D. Ca. 1995) .................................................................. 6, 7

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) .................................................................. *passim*

*Soc'y of Holy Transformation Monastery Inc. v Gregory*,
    689 F.3d 29 (1st Cir. 2012) .................................................................. 15

*Sony Corporation of Am., Inc. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .................................................................. *passim*

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975) .................................................................. 28

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
    480 F. Supp. 429 (C.D. Cal. 1979) .................................................................. 19

## STATUTES

17 U.S.C. § 107(1) ............................................................................ 16

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. 1, § 8 ...................................................................... 10

## OTHER AUTHORITIES

Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 198
    (2nd ed. 2011) ............................................................................ 8

# STATEMENT OF INTEREST[1]

*Amici curiae* submit this brief pursuant to Fed. R. App. P. 29.  All parties have consented to the filing of this brief.

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world.  Founded in 1990, EFF represents more than 28,000 dues-paying members.  On behalf of its members, EFF promotes the sound development of copyright law as a balanced legal regime that fosters creativity and innovation while respecting individual rights and liberties.  EFF's interest with respect to copyright law reaches beyond specific industry sectors and technologies to promote well-informed copyright jurisprudence.  In this role, EFF has contributed its expertise to many cases applying copyright law to new technologies, as amicus curiae, as party counsel, and as court-appointed attorneys *ad litem*.

Public Knowledge ("PK") files this brief to protect the fair use rights of television users, and to argue for legal principles that allow new business models to succeed, and new technologies to reach the market.  PK is a non-profit public

---

[1] No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

interest 501(c)(3) corporation, and its primary mission is to promote technological innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest. Applying its years of expertise in these areas, PK frequently files amicus briefs at the district and appellate levels in cases that raise novel issues at the intersection of media, copyright, and telecommunications law.

Organization for Transformative Works ("OTW") is a 501(c)(3) organization that represents the interests of media fans and other noncommercial creators before the Copyright Office and has filed amicus briefs on significant issues of intellectual property law. OTW supports the legality of technologies that facilitate fair uses by end users, including time shifting and copying for the purpose of fair use. For example, the popular fanwork genre of noncommercial videos ("vids") uses clips from television shows or film, reworking them in a way that comments on or critiques the original. The Copyright Office has held that substantial numbers of vids constitute fair uses. But the creation of fan vids requires intermediate digital copying and processing in order to produce the transformative final product. OTW thus believes that intermediate copying performed to facilitate fair use constitutes fair use. An important safeguard for consideration of that fair use is the volitional act requirement, which

appropriately focuses the direct infringement analysis on the author of the copy and, in turn, allows for consideration of whether that author's use is fair.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For consumers, having control over when, where, and how to watch TV shows broadcast on the public airwaves is valuable.  The Hopper digital video recorder created by the DISH appellees creates value for their customers by enabling this control, including control over the viewing of commercials, with more ease and intuitiveness than prior generations of video recorders.  The fundamental question in this case is, to whom does the Copyright Act assign that value – to the public, or to copyright holders like the appellants?

Supreme Court precedent answers that question.  TV watchers do not infringe when they record a program for later viewing, nor when they skip commercials while playing back the recording.  And neither are the makers of technologies that facilitate that activity.

ABC hopes to avoid that clear precedent, and subsequent holdings that clarify that the liability analysis must attend to who, if anyone, performs the volitional act of copying. ABC advances a ranges of theories that, if adopted, would not only harm DISH and its customers, but also undermine the public interest in innovation, contrary to copyright's Constitutional purpose.  The volitional conduct requirement, strong fair use protections, and rigorous

3

application of the preliminary injunction factors all help ensure that technology makers can develop and offer new tools and services without fear of crippling liability and/or shutdown where, as here, those tools and services are capable of substantial non-infringing uses and the provider does not perform the additional actions that might subject it to secondary liability.

Amici urge the Court to protect the public interest and affirm the district court's decision.

## I.    THE DISTRICT COURT'S VOLITIONAL ACT ANALYSIS IS CORRECT AND COMPORTS WITH COPYRIGHT'S PURPOSES.

ABC does its best to sidestep the volitional act requirement, insisting that DISH, not its customers, makes the "copying decisions," even though as DISH notes, "users who do enable PTAT are responsible for choosing: which networks to record . . . which nights to record those networks . . . how long to maintain those recordings (anywhere between 2 and 8 days)."   Redacted Brief for Plaintiff-Consolidated Defendant-Counter-Defendant-Appellee Dish Network v. ABC, No. 13-3573 (2d Cir. Jan. 17, 2014), ECF No. 129 ("Dish Br.") at 20, citing JA 2283.   On ABC's theory, virtually any company that provides a service that enables customers to make copies is directly liable if the copies happen to infringe. As this Court recognized in *Cartoon Network LP, LLP v.*

4

*CSC Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008) ("Cablevision").  That is precisely what the volitional act requirement is intended to prevent.

DISH discusses *Cablevision* in detail, and Amici will not repeat the analysis here.  Rather, we seek to remind the Court that there is more at stake in this case than whether DISH's AutoHopper service will survive.  Equally at issue is the correct interpretation of volitional conduct: as an easily met threshold requirement for copyright liability, or as a necessary means of determining whether direct infringement or secondary liability doctrines, with their particular elements and defenses, should apply.

Amici submit that both law and the public interest favor the latter.  The cases addressing copyright's volitional conduct requirement draw a pragmatic liability boundary between the activities of tool *makers* and those of tool *users*.  That boundary is grounded in the words of the Copyright Act, clear case law, and traditional tort principles.  It is also sound policy, consistent with copyright law's constitutional purpose.  It directs courts to evaluate the relationships between technology providers and users, and their respective activities, and decline to hold the former directly liable for the conduct of the latter in most circumstances.  Any other approach would retard innovation, for toolmakers would be forced to police every use of their technologies – or not allow their use at all.

The decision below reflects that prevailing, commonsense rule. After careful analysis of the factual record, the court concluded that the TV viewer, not DISH, makes the "PTAT copies," and that DISH's liability, if any, must be based on its knowing contribution to alleged infringement by those individuals, subject to individuals' fair use defenses. In keeping with sound precedent and policy, Amici urge the Court to affirm the district court's correct application of the volitional conduct requirement.

## A.    The Volitional Conduct Requirement Is Grounded in Statutory and Common Law.

The Copyright Act expressly requires an affirmative act of copying as a prerequisite for direct infringement liability. The Act defines infringement as "the unauthorized exercise of one of the exclusive rights of the copyright holder delineated in section 106." *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs., Inc.*, 907 F. Supp. 1361, 1367 (N.D. Ca. 1995). With regard to the reproduction right, infringement requires "'copying' of protectable expression by the defendant*." Id*. at 1366-67 (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987)). Taking that requirement seriously, courts have consistently tied direct liability to the "authorship of the infringing conduct." *Cablevision*, 536 F.3d 121 at 130.

6

The leading case in this circuit is *Cablevision*. The key question in that case was identical to that at issue here: if a service provider provides a system that allows a subscriber to remotely record a program for playback later, and the copy resides on the service provider's servers, who makes the copy? The Court concluded that the subscriber was the "author" of the copy, not the service provider. Cablevision merely provided the means for doing so, a more technologically complex iteration of a videocassette recorder. *Id.* at 133.

As this Court also recognized, however, the jurisprudential foundations of the volitional conduct doctrine go back rather further. *Id.* at 130-31. With respect to digital technologies, modern volitional conduct jurisprudence is rooted primarily in *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs.*, 907 F. Supp. 1361, in which the court held that "installing and maintaining a system" that makes copies at the command of another does not amount to direct infringement absent a volitional act of copying. *Id.* at 1367. According to this Court, that conclusion was "a particularly rational interpretation of § 106." *Cablevision,* 536 F.3d at 131 (citing *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004)).

The Fourth Circuit Court of Appeals has also endorsed the *Netcom* decision, noting that

> to establish *direct* [copyright] liability . . . [t]here must be actual infringing conduct with a nexus sufficiently close and causal to the

7

> illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.

*CoStar Group, Inc. v. LoopNet, Inc*., 373 F.3d 544, 550, 556 (4th Cir. 2004) (Internet service's "perfunctory gatekeeping process" does not create direct infringement liability).

The volitional act requirement for direct infringement also embodies well-established general principles of legal causation. In nearly every area of law, including federal statutory law, the "so-called proximate cause issue is not about causation at all but about the appropriate scope of legal responsibility." Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 198 (2nd ed. 2011) ("Dobbs"); *see also Martinez v. California*, 444 U.S. 277, 285 (1980) (in civil rights case, holding that officers whose actions were remote from the injury suffered could not be held liable); *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (in civil damages action under antiterrorism statute, tort principles limit the universe of directly liable parties); *Baylor v. United States*, 407 A.2d 664, 670 (D.C. 1979) (applying tort principles of legal causation in a homicide case). Liability limitations "reflect the ideas of justice as well as practicality. In particular, the rules of proximate cause or scope of liability attempt to limit liability to the reasons for imposing liability in the first place." Dobbs § 199.

While direct liability was not at issue in the case, the Supreme Court's analysis in *Sony Corporation of Am., Inc. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), also recognizes the importance of identifying who, if anyone, is actually doing the allegedly infringing act. In that case, a copyright owner sought to hold a toolmaker liable because the tool it produced could be used to infringe. The Court rejected the claim because (as discussed in greater detail *infra* at II.A) the tool could also be used to engage in non-infringing fair uses. The Court compared the facts in *Sony* to those of *Kalem Co*. *v. Harper Brothers*, 222 U.S. 55 (1911), in which the defendant has personally sold an unauthorized copy of a film to distributor, and then advertised the unauthorized performance of that work. Thus, the Court stressed, the defendant in *Kalem* did not merely "provide the 'means' to accomplish an infringing activity . . . [he] supplied the work itself . . . ." *Sony*, 464 U.S. at 436. In other words, the defendant engaged in volitional conduct closely and directly tied to an infringing public performance. Sony, by contrast, had merely provided the means by which users could engage in both infringing and noninfringing activities.

Thus the Supreme Court, appellate courts (including this Court), and the district court in this case agree: "the mere provision of the technology or system through which customers can make copies" cannot constitute infringement. *Dish Network v. ABC*, No. 12 Civ. 4155 (S.D.N.Y. Oct. 1, 2013), ECF No. 232

9

("Order") at 11, citing *Sony*, 464 U.S. at 435 ("vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another."); *CoStar*, 373 F.3d at 550.[2]

### B.    The Volitional Conduct Requirement Promotes the Progress of Science.

Another thread running through the cases applying copyright to new technologies is the importance of minimizing copyright law's interference with commerce and innovation.  This is grounded in copyright's constitutional purpose: to "Promote the Progress of Science and useful Arts." U.S. Const. art. 1, § 8.  To help ensure that copyright law fulfills that mandate, the Supreme Court warned against granting copyright holders "control over an article of commerce that is not the subject of copyright protection." *Sony*, 464 U.S. at 421.

The volitional conduct standard serves that very end: by keeping the tool-user front and center, it helps ensure that tools are not adjudged illegal without considering the role of the user, and the defenses that might protect her actions. That attention, in turn, helps ensure that copyright does not give copyright

---

[2] Indeed, even where courts have found that a defendant provided a technology specifically for the purposes of facilitating infringement, it was found liable under secondary liability principles only.  *See, e.g. A&M v. Abdallah*, 948 F. Supp 1449 (C.D. Cal. 1996).

holders the power to control articles of commerce and impede innovation. Many non-infringing uses that are commonplace today depend on copying that was once performed exclusively on self-contained personal devices, such as VCRs and personal computers that were unquestionably under the user's control. This includes recording and time-shifting TV programs, word processing, video game playing, and many personal computing tasks. Today, these same tasks are increasingly performed by a combination of personal devices and centralized equipment, acting together over a communications medium such as the Internet or a cable network. This has many advantages: it allows for constant improvement of the product in situ, including fixing security flaws or other dangerous conditions immediately. It saves energy, materials, and manufacturing costs by consolidating equipment at a central location.

However, as with any attempt to apply old law to new technology, this shift creates analytical complexity. Functions that were once handled by products in the home are now carried out, at least in part, on equipment that remains under the physical control of the toolmaker, or for which the toolmaker can modify the software remotely. The basic functions of a device and the parameters under which it operates can change over time; the toolmaker can add or remove features without having to sell a new product. The relationship between toolmaker and user has also become more complex; no longer a one-

11

time transaction of buyer and seller but an ongoing, subscription-based relationship.

Nonetheless, at the end of the day the user still makes the decisions about where and how to copy. In other words, she still engages in the volitional acts that constitute copying. Just as a ladder extends a person's physical reach, a device that automates previously "manual" functions such as controlling the time, place, and format of a video playback is a tool by which a person extends her ability to act in the world. The volitional act requirement ensures that her actions, and interests, are central to determining liability. That, in turn, allows toolmakers, to consider the tool user's actions as they assess their potential liability in the event that a technology they offer is used for unauthorized as well as authorized purposes.

To be clear, deciding whether a technology provider should be judged under direct or secondary liability regimes does not in itself determine whether the provider is liable. A technology provider who knowingly, materially contributes to customers' infringement can be found liable, but only after due consideration of whether customers are in fact infringing, and the nature and degree of the technology provider's contribution. Importing questions of a technology provider's "contribution" to alleged customer infringement into the direct infringement regime, Brief of Counterclaim Plaintiffs-Appellants Dish

12

Network v. ABC, No. 13-3573 (2d Cir. Nov. 20, 2013), ECF No. 80 ("ABC
Br."), at 38-40, rather than considering them in the secondary liability context,
improperly paints the tool user out of the picture – and her fair use defenses as
well.

    **C.**    **The District Court Correctly Applied the Volitional Conduct
Requirement in Finding that DISH Users Make the PTAT
Copies.**

In their holdings on technology providers' lack of volitional conduct, this
Court in *Cablevision*, and the district court in this case, applied the principles of
legal causation that apply in nearly all areas of law. The most important factor
in these decisions is the distinction between *doing the copying* and *establishing
the parameters under which the device makes copies*. This Court held that
having "control over what programs are made available on individual channels
or when those programs will air" is categorically different from merely offering
customers the ability to record channels as they are broadcast or cablecast.
*Cablevision*, 536 F.3d at 132. Likewise, the district court in this case found that
DISH's possible involvement in determining parameters for copying – the
beginning and end times of the prime-time programming block, the channels
that can be recorded, and the length of time that copies are saved – is not the
same as authoring the copying. Order at 13. The court held that setting these
parameters of copying is distinct from "doing" the copying.

13

This is a sound distinction, because every maker of a recording device or service sets some parameters as part of the design of the device or service. The videocassette recorder at issue in *Sony* could record only from the set of channels that its tuner was built to resolve, and only within the maximum time allowed by the design of its tapes. These parameters are the equivalent of those set by Cablevision and DISH, such as limiting the number of days that PTAT recordings are saved. In each case, the broadcast and cable networks (the plaintiffs) decide what programs will air, and when. The recording device simply gives the viewer more control over when and how to make personal use of those programs.

ABC's claims that DISH is nonetheless a "dominant contributor" or, in the alternative, a joint actor, not only fall short of the mark, they represent a dangerous attempt to eliminate the volitional act requirement. As noted, it is increasingly common for consumers to rely on various services to perform their copying for them – just as Cablevision did for its DVR subscribers. If providing such a service makes one a "dominant contributor," then the volitional act requirement loses all meaning, to the detriment of the consumer. Cloud computing services such as online storage lockers, for example, copy and store all sorts of material for their customers, but they are no more volitional actors than the library that houses a fax machine.

14

The ReDigi case doesn't say otherwise. In that case, the court found ReDigi liable based on its conclusion that ReDigi existed primarily to facilitate the distribution of copyrighted content. *Capitol Records, LLC v. ReDigi*, 934 F. Supp. 2d 640, 653-54 (S.D.N.Y. 2013). ReDigi (or at least the version of the service at issue) actually helped its customers re-distribute their music. DISH, by contrast, is much more akin to the service at issue in *Cablevision*: it simply allows a customer to more easily access and copy a variety of primetime broadcast programs for viewing later by that customer, at the customer's election, and then deletes those programs automatically.

As for ABC's joint liability theory, in the principal case cited, *Soc'y of Holy Transformation Monastery Inc. v Gregory*, 689 F.3d 29 (1st Cir. 2012) the court explicitly declined to reach the volitional act question, in part because the defendant had admitted his involvement in the copying at issue. *Id.* at 54. At any rate, the fact that it is possible for more than one person to engage in volitional conduct does not mean DISH is such a person.

The district court's finding that DISH does not make the PTAT copies was not an "unwarranted extension" of *Cablevision*, but rather a logical application of its rule, one faithful as well to both Supreme Court precedent and the fundamental purposes of copyright. It should be upheld.

## II.    DISH'S USERS ARE FAIR USERS.

Having disposed correctly of ABC's direct liability claim, the district court turned to the question of secondary liability and came to a similarly correct conclusion.  For DISH to be liable as a secondary infringer, there must first be a direct infringer.  *Faulkner v. National Geographic Enters.,* 409 F.3d 26, 40 (2d Cir. 2005) ("there can be no contributory infringement absent actual infringement").  The only direct copying at issue with respect to the "PTAT copies" is done by DISH customers who record programming in the privacy of their homes for time-shifting (regardless of whether they skip commercials).

More than three decade ago, the Supreme Court held that such copying is a noninfringing fair use. *Sony*, 464 U.S. at 448-56.  ABC's attempt to avoid clear Supreme Court precedent by insisting that *this* time-shifting is different must fail.  ABC Br. at 56-59.  While the Hopper is certainly more advanced than VCRs of the late 1970s, and more convenient to use, it is not legally distinguishable from those technologies and the personal uses they enable.

### A.    Commercial Skipping Is Not A Commercial Use.

The purpose and character of the use here, per 17 U.S.C. § 107(1), is the same as it was in *Sony*: "private, noncommercial time-shifting in the home." *Sony*, 464 U.S. at 442.  After *Sony*, courts have consistently held that a use of copyrighted material that implicates a Section 106 right "for private home

enjoyment must be characterized as a non-commercial, nonprofit activity," *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 970 (9th Cir. 1992), and have described similar uses, such as space-shifting, as "paradigmatic noncommercial personal use[s] . . . ." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999). Thus, this factor weighs heavily in favor of viewers (and, therefore, DISH).

ABC nonetheless insists that if (1) the Hopper is primarily designed to facilitate commercial skipping, not time-shifting per se; and (2) if commercial-free versions of *some* programs are available on iTunes, then commercial skipping is a commercial use because it helps customers avoid paying for a commercial-free experience. ABC Br. at 52, 59.

That theory cannot withstand serious scrutiny. Viewers are time-shifting regardless of the manner in which they watch the programming at a later time. Time-shifting under *Sony* does not stop being time-shifting if a viewer mutes the program, walks out during the second half, gets up to make snacks during the commercials, or skips past the commercials. Moreover, ABC does not offer commercial-free video-on-demand on the day of the actual broadcast, so there is no alterative customers might choose instead.

ABC's complaint does, however, surface the real question in this case: whether copyright law allows broadcasters to control all the uses that viewers

make of their works.  The answer is simple: it does not.  *Sony*, 464 U.S. at 432 (copyright "protection has never accorded the copyright owner complete control over all possible uses of his work").  ABC has the right to control the reproduction,[3] public performance, and initial distribution of its works, but it has never had the right to control their private consumption.  A viewer can watch as much or as little of ABC's programming as she wishes, with the sound on or off, with commercials or without, on any screen.  She may change the channel during the commercials, or overlay a show with a program guide.  Whether ABC approves of these uses is immaterial, since its approval is not necessary.

## B.    Broadcast Works Are Public in Nature.

The second fair use factor, the nature of the copyrighted work, likewise favors viewers because the works in question are made widely available, and are broadcast over the air for the public to watch on any device, free of charge.  "[T]imeshifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge . . . ."  *Sony*, 464 U.S. at 449.

---

[3] While later actions (such as a viewer's skipping commercials, or the opposite) can have no bearing on whether a use which took place in the past (making a recording) was fair, the *intent* of the party making a use of a copyrighted work may have bearing on fair use analysis.  *Harper & Row*, 471 U.S. at 562 (giving weight to the "intended purpose" of an act).  In this case, however, any purported market effects arising from a viewer skipping commercials should be considered as part of the fourth fair use factor, which is discussed below.

When works are broadly disseminated to the public, users' fair use rights are stronger. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985) (finding that fair use rights are stronger for published works than for unpublished).

Moreover, because ABC, like all broadcasters, is "granted the free and exclusive use of a limited and valuable part of the public domain," *Office of Commc'n of United Church of Christ v. FCC*, 359 F.2d 994, 1003 (D.C. Cir. 1966), ABC "is burdened by enforceable public obligations . . . ." *Id.* Attempting to use copyright claims to impede new and innovative services that improve public access hardly comports with those obligations. As the Supreme Court has found (and the district court recognized), "to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits." *Sony*, 464 U.S. at 454; Order at 15. This use, said the Court, "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Sony*, 464 U.S. at 425 (quoting *Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 454 (C.D. Cal. 1979)). In light of this policy and precedent, this factor favors a fair use finding.

### C.    Time-Shifting Requires the Whole Work to Be Copied.

The Supreme Court recognizes that "the extent of permissible copying varies with the purpose and character of the use."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586–87 (1994).  Put another way, the third fair use factor considers whether a person copies more of a work than is necessary for her purpose.  *Harper & Row*, 471 U.S. at 564-65.  Because the fair use of time-shifting *requires* making copies of the work as a whole, viewers copy no more than necessary for their purpose, and this factor either favors the viewer or, at worst, is neutral.

Moroever, because here, as in *Sony*, time-shifting is a noncommercial use of broadcast programming that is made freely available, the reproduction of an entire work "does not have its ordinary effect of militating against a finding of fair use," *Sony*, 464 U.S. at 449-50.

### D.    There Is No Effect on Any Likely Markets.

ABC makes much of the language in *Sony* that suggests that if a particular use "should become widespread" and "adversely affect the potential market for the copyrighted work," it might not be fair. ABC Br. at 53 (citing *Sony*, 464 U.S. at 451).  ABC complains that if use of the Hopper becomes widespread, it will impair ABC's market for video-on-demand and deprive ABC of its principal source of revenue: commercials.  ABC Br. at 54-55.

But the Court in *Sony* was well aware that some users might use time-shifting to record large blocks of programming and bypass commercials. *Sony*, 464 U.S. at 423, 424 n.4  ("The pause button . . . enabl[es] a viewer to omit a commercial advertisement from the recording . . . . The fast-forward control enables the viewer of a previously recorded program to run the tape rapidly when a segment he or she does not desire to see is being played back on the television screen."; noting many VCR users had a library of tapes).  The Court found time-shifting fair nonetheless.

The crux of the matter is that ABC, like the plaintiffs in *Sony*, cannot show that time-shifting, even with commercial-skipping, causes cognizable harm.  Since home recording is a noncommercial activity, ABC must show through "a preponderance of the evidence that *some* meaningful likelihood of future harm exists" because of its viewers' actions.  *Sony*, 464 U.S. at 451 (emphasis in original).

ABC attempts to meet this burden by insisting that DISH interferes with its market for video-on-demand services and its ability to extract advertising revenue.  But video-on-demand service and time-shifting are not the same thing: time-shifting allows users to watch recently-aired shows that they might not have been able to watch live.  Video-on-demand services, by contrast, offer access to a comprehensive back catalog of movies, entire runs of television

21

series, and more.  By creating a false equivalence between video-on-demand and time-shifting, ABC is attempting to show harm where there is none.

And even if ABC does plan to offer some new service that actually emulates time-shifting, it cannot show harm to a "traditional, reasonable, or likely to be developed" market for over-the-air broadcast programming.  *Am. Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 930 (2d Cir. 1994).  A copyright holder may not postulate harm to a hypothetical market where it sells to consumers the right to do things they now enjoy for free, such as the right to record programming and view it, at whatever time they choose, commercial free – something ABC clearly does not intend to do.  As this Court observed in *Texaco*,

> [A] copyright holder can *always* assert some degree of adverse affect [sic] on its potential licensing revenues as a consequence of the secondary use at issue simply because the copyright holder has not been paid a fee to permit that particular use. . . . Thus, were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder.

60 F.3d 913, 929 n.17 (citations omitted) (emphasis in original).

Moreover the Southern District Court of New York noted, "[a] copyright holder cannot preempt a transformative market"[4] such as the one DISH is

---

[4] A use need not itself be transformative to belong to a transformative market.  In this case, time-shifting is a transformative use because it enables

helping to create. *Authors Guild, Inc. v. HathiTrust,* 902 F.Supp.2d 445, 463 (S.D.N.Y. 2012) (citing *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 614–15 (2d Cir. 2006)). In that case, even though the defendant HathiTrust made complete copies of copyrighted literary works for the purpose of enabling full-text searching and disabled access, the Court found that its uses were transformative, did "not significantly impact a market," and were not unlawful. *Id.* at 463–66. Because of this, the Court disregarded claims by plaintiffs that HathiTrust's uses might "undermin[e] existing and emerging licensing opportunities." *Id.* at 463. Indeed, as this Court has held, "a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing [competing uses].'" *Bill Graham Archives*, 448 F.3d at 614–15 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 146 n.11 (2d Cir. 1998)).

Finally, ABC's harm analysis conflates the PTAT and AutoHop services. A viewer's choice not to view commercials at most might implicate an advertiser's copyright interest in those commercials, but ABC has no such interest. ABC has no licensing market for commercials and therefore no market to be harmed. It may have a copyright interest in its actual programs, but, again,

---

ways of viewing a program that are wholly different than watching it live over-the-air. Even if this Court finds that it is not a transformative use, time-shifting is part of a transformative market because broadcasters do not traditionally sell viewers the right to record programming and watch it at other times.

the AutoHop service does not implicate that interest.  And while AutoHop may undermine the traditional funding mechanism for ABC's programming, but the Copyright Act was neither designed nor intended to prevent business disruption.

Taken as a whole, the fair use factors weigh heavily in favor of DISH (or more specifically, its users).  That is the right result not just for DISH but for the public.  ABC's argument that time-shifting and watching a program commercial-free constitutes infringement cannot be limited to the Hopper. Rather, under ABC's theory, millions of Americans, whether they subscribe to Comcast or Time Warner Cable, DISH or DirecTV, or whether they simply watch TV broadcast over the air, commit copyright infringement each and every time they time-shift programming and skip commercials by fast-forwarding. But "[o]ne may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home . . . ."  *Sony*, 464 U.S. at 456.

## III.   ANY HARMS THAT ABC ALLEGES ARE QUANTIFIABLE, AND DO NOT SUPPORT A PRELIMINARY INJUNCTION

An irreparable harm is one that cannot be remedied by damages or permanent injunction after a trial on the merits.  *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).   There are no shortcuts: irreparable harm must be

24

demonstrated, not presumed, and speculative injury is not sufficient. *See Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) ("To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent. . . ." (internal quotation marks and citation omitted)).  Moreover, the harm must be one that cannot be remedied by money damages. *Salinger*, 607 F.3d at 81.

This is a significant burden, and ABC does not meet it. ABC's allegations of harm reduce to a claimed loss of advertising and licensing revenue.  Both are economic harms that can be compensated with money.  ABC complains that the district court required a showing of actual and imminent injury, but the Order does not support that claim.  While it noted that ABC had not shown that injury, it also found that ABC had failed to demonstrate any likelihood, beyond mere speculation and conclusions, that commercial-skipping would increase – the key to ABC's theory of harm.   ABC Br. at 44; Order at 18-22.

Moreover, ABC could straightforwardly attach a number to any such lost revenue.  First, even if the Hopper deprived ABC of *all* advertising revenue with respect to DISH customers, it would be a straightforward matter for ABC to calculate what proportion of its advertising revenue is attributed to DISH viewers and produce a damages sum accordingly.  That there may be a factual

dispute as to an exact amount of damages does not make such damages "irreparable."

Second, ABC claims that DISH "disrupts" its ability to distribute programs in video-on-demand and digital channels. But presumably ABC knows how much revenue it generates from those and similar channels and can use those figures to benchmark harms in this case. As the district court found, "the number of venues to which ABC has licensed its programs and its licensing practices [make clear] that whatever harm may result is calculable and compensable with money damages." Order at 20.

ABC puts forward a number of other harms arguments that are easily dismissed. ABC repeatedly invokes "disruption" and "loss of control" as harms this Court should seek to remedy. ABC Br. at 63-64. According to ABC, *Salinger* essentially stands for the principle that any interference with the right to exclusive control of one's copyrights can be an irreparable harm.

That theory creates precisely the kind of categorical rule *eBay* forbids. Many if not all allegedly infringing activities interfere with the right to exclude; that does not make them irreparable harms unless that interference *also* cannot be compensated with money. *Salinger*, 607 F.3d at 81.

More generally, ABC suggest that a new, relatively small company is doing *irreparable* harm to an entire large, well-established industry merely by

entering the market and continuing to operate while litigation proceeds.  ABC portrays itself as having fragile business models at the mercy of larger forces.  Amici do not believe they are so fragile.  But in any event, damage to ABC's existing business model is not, in and of itself, the kind of harm copyright is intended to address.  As the district court found, even to the extent that these more abstract concerns are "harms" at all, ABC has not shown that they stem from any *infringing* behavior by DISH. Order at 13, 20.

Finally, the public interest weighs firmly against an injunction.  As noted in *Salinger*, the public at large has an interest separate and distinct from that of the parties.  607 F.3d at 79, 82 ("[A]t minimum, we must consider whether irreparable injury is *likely* in the absence of an injunction, we must balance the competing claims of injury, and we must pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (internal quotation marks and citation omitted).

That public interest is not commensurate with copyright enforcement.  Instead, copyright law traditionally balances the public interest in supporting authors with the public interest in the ability to access and build on our common culture:

> The limited scope of the copyright holder's statutory monopoly . . . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must

ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975); *see also Salinger*, 607 F.3d at 82 ("The public's interest in free expression, however, is significant and is distinct from the parties' speech interests.").

Thus, the public interest lies not merely in protecting as strenuously as possible the bounds of a plaintiff's copyrights, nor even in protecting the legitimate interests of the defendant's ability to do business. The public has a strong interest in, *inter alia*, lawful access to creative works, competition among technology providers, and innovation. Allowing DISH to continue to provide an innovative and valued service furthers that interest.

The public interest factor is especially important here, where the content at issue is broadcast programming. As noted, while ABC portrays itself as rightsholder pursuing typical copyright infringement claims, it is not a typical private rightsholder. It is a public trustee, given significant public benefits and expected to serve the public interest in return. Notably, they are required to provide a free, universally available programming service to the public. The Hopper simply makes that service better, to the benefit of DISH's customers.

Amici urge the Court to affirm the district court's appropriately rigorous preliminary injunction analysis and conclusions.

28

## CONCLUSION

For the foregoing reasons, Amici urge the Court to affirm the district court's decision.

Dated: January 24, 2014

By:  /s/ Corynne McSherry
Corynne McSherry
Mitchell Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*

*On the brief:*

Sherwin Siy
John Bergmayer
PUBLIC KNOWLEDGE
1818N. St. NW, Suite 410
Washington, DC  20036
Tel.:  (202) 861-0020
ssiy@publicknowledge.org

*On the brief:*

Rebecca Tushnet
Betsy Rosenblatt
ORGANIZATION FOR TRANSFORMATIVE
WORKS
2576 Broadway, Suite 119
New York, NY 10025
Tel.:  (703) 593-6759
rlt26@law.georgetown.edu

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amici Curiae Electronic Frontier Foundation, Public
Knowledge, and Organization for Transformative Works In Support Of
Appellees And Affirmance complies with the type-volume limitation of Fed. R.
App. P. 32(a)(7)(B) because this brief contains 6,619 words, excluding the parts
of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App.
P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because
this brief has been prepared in a proportionally spaced typeface using Microsoft
Word 2011, the word processing system used to prepare the brief, in 14 point
font in Times New Roman font.

Dated:  January 24, 2014

By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January, 2014, a true and correct copy of the foregoing Brief of Amici Curiae Electronic Frontier Foundation, Public Knowledge, and Organization for Transformative Works In Support Of Appellees And Affirmance was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: January 24, 2014

By:  /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*