**PAGE PROOF**

# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),
13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON),
14-32-cv(CON), 14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON),
14-157-cv(CON), 14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON),
14-219-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),
14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON)
14-422-cv(CON), 14-443-cv(CON), 14-480-cv(CON), 14-497-cv(CON),
14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),
14-663-cv(CON), 14-837-cv(CON)**

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

## REPLY BRIEF FOR OBJECTORS-APPELLANTS
## NATIONAL RETAIL FEDERATION
## AND RETAIL INDUSTRY LEADERS ASSOCIATION
## (THE MERCHANT TRADE GROUPS' REPLY BRIEF)

Andrew G. Celli, Jr.
Debra L. Greenberger
EMERY CELLI BRINCKERHOFF
  & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
212-763-5000

*Attorneys for Objectors-Appellants
National Retail Federation
and Retail Industry Leaders Association*

# **TABLE OF CONTENTS**

**PAGE NO.**

TABLE OF AUTHORITIES ...............................................................................iii-v

INTRODUCTION ..............................................................................................1

ARGUMENT ....................................................................................................5

    I.     THE CASH PAYMENT CANNOT BE USED TO SUPPORT
         APPROVING THE (B)(2) CLASS SETTLEMENT ...........................6

    II.    THE INJUNCTIVE RELIEF PROVIDES SCANT BENEFIT TO
        THE (B)(2) CLASS...........................................................................11

          A.    The Settlement Preserves the Surcharging Ban in
               Crucial Ways.....................................................................12

          B.    The Court-Appointed Expert Concluded That Surcharging
               Is of Little Value ..............................................................16

          C.    Proponents Overstate the Import of Surcharging Relief
               and Ignore the Best Possible Relief at Trial .............................17

    III.   THE RELEASE IS UNFAIR BECAUSE IT THREATENS
        COMPETITION FROM TECHNOLOGICAL INNOVATION
        AND GIVES DEFENDANTS MORE THAN THEY COULD
        RECEIVE FROM A DEFENSE VERDICT AT TRIAL ..................19

    IV.   THE MERCHANTS' ANTITRUST CLAIMS ARE STRONG ........26

          A.    The IPOs Kept the Horizontal Restraints in Place....................26

          B.    Defendants Ignore Critical Inquiries Under the
               Rule-of-Reason ........................................................................27

          C.    *Illinois Brick* Is Irrelevant to the Class's Injunctive Claims.....32

V.    THE OPPOSITION TO THE SETTLEMENT FROM THE
TRAPPED CLASS IS EXTRAORDINARY......................................33

CONCLUSION......................................................................................35

CERTIFICATE OF COMPLIANCE.......................................................36

# TABLE OF AUTHORITIES

**PAGE NO.**

**Cases**

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010)......................................................................................26

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).......................................................................................9

*Boone v. City of Phila.*,
   668 F. Supp. 2d 693 (E.D. Pa. 2009)...........................................................8

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) .........................................................................28

*Charron v. Pinnacle Group N.Y. LLC*,
   874 F. Supp. 2d 179 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013), *cert. denied* 134 S. Ct. 1941 (2014) ...........9, 10

*Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013) ........................................................................10

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ................................................................. *passim*

*Dana's R.R. Supply v. Bondi*,
   14-cv-134-RH/CAS (N.D. Fl. Sept. 2, 2014)................................................14

*Hawksbill Sea Turtle v. FEMA*,
   126 F.3d 461 (3d Cir. 1997) .........................................................................24

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)................................................................................ 32, 33

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ..................................................................... 14, 16

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ...................................................................7, 25

*In re Visa Check/MasterMoney Antitrust Litigation*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc.
v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005)......................... 22, 25, 31, 33

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012)....................................................................23

*La. High Sch. Athletic Ass'n v. St. Augustine High Sch.*,
396 F.2d 224 (5th Cir. 1968) .......................................................................15

*Maywalt v. Parker & Parsley Petrol.*,
67 F.3d 1072 (2d Cir. 1995) ..........................................................................8

*McBean v. City of N.Y.*,
233 F.R.D. 377 (S.D.N.Y. 2006)..................................................................8, 9

*McClintic v. Lithia Motors, Inc.*,
No. C11-859(RAJ), 2012 WL 112211 (W.D. Wash. Jan. 12, 2012) ............19

*National Bancard Corp. v. Visa U.S.A., Inc.*,
779 F.2d 592 (11th Cir. 1986) ......................................................................28

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
602 F. Supp. 2d 277 (D. Mass. 2009), *aff'd sub nom. Nat'l Ass'n of Chain
Drug Stores v. New England Carpenters Health Benefits Fund*,
582 F.3d 30 (1st Cir. 2009)............................................................................10

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999).........................................................................................9

*Parker v. Time Warner Entm't Co.*,
239 F.R.D. 318 (E.D.N.Y. 2007)...................................................................16

*Thompson v. Metro. Life*,
216 F.R.D. 55 (S.D.N.Y. 2003)........................................................................8

iv

*U.S. v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)..................................................................30

*U.S. v. Visa*,
   163 F.Supp.2d 322 (S.D.N.Y. 2001), *aff'd* 344 F.3d 229 (2d Cir. 2003)
   ................................................................................ *passim*

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).....................................................30

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) .......................................................22

## Other Authorities

Fed. R. Civ. P. 23 .............................................................. *passim*

Federal Practice and Procedure: Jurisprudence § 4417 (2d ed. 2002)....................25

# INTRODUCTION

Our judicial system places a high value on the voluntary resolution of disputes, and parties in conflict are given every encouragement to chart their own course. But class action settlements are different. Peace for peace's sake is not, in this context, a value at all: When class-wide settlements are proffered for court approval under Rule 23, class counsel and their defense counterparts must *justify* what they have wrought against a standard of fairness and adequacy. The reason, of course, is that a class-wide settlement will affect the rights of absent class members—in this case, millions of them—who did not agree to the terms of settlement, and who, in the case of a (b)(2) settlement like this one, have no opportunity to hold themselves apart. Moreover, because individuals and businesses best understand their own interests, mandatory class settlements that engender widespread objection must be viewed with great skepticism. Where these conditions obtain, the obligation of the settlement's proponents to justify what they have done, and the obligation of the courts to scrutinize it, is at its apex.

The submissions of Class Plaintiffs-Appellees and Defendants-Appellees (collectively, "Proponents") fail to satisfy this high standard. Against the backdrop of strong objection from the most sophisticated retailers in the

country, Proponents return, time and again, to *post hoc* arguments about what was "possible" and "achievable" in settlement, rather than affirmatively demonstrating that the meager results obtained for the Rule 23(b)(2) class are fair and adequate, as Rule 23(e) requires. Unable to find supportive case law, Proponents point only to the district court's decision, as if this Court should abdicate its duty to scrutinize the (b)(2) Settlement in deference to the trial court whose decision is being challenged.

Stripped to its essence, Proponents' response amounts to the claim that the $7.25 billion fund obtained for the (b)(3) class justifies every failing of the (b)(2) Settlement. But that fund can't answer every question; indeed, it doesn't answer *any* question in the (b)(2) analysis under *Grinnell*, because monetary relief provided to the (b)(3) class has no bearing on the fairness of the largely inaccessible injunctive relief and overbroad release this Settlement imposes on the distinct (b)(2) class. While Proponents claim the (b)(2) Settlement is "fair" because of the "historic" damages fund obtained for the (b)(3) class, there is no authority approving a settlement that requires one class to sacrifice so that a different class can benefit. Indeed, the law expressly forbids such trade-offs. Here, thousands of opt-outs and millions of newly-formed and future merchants

are bound by the (b)(2) Settlement, including its forward-looking release, but none will receive a penny from the (b)(3) settlement. *See infra* Section I.

The Proponents (and particularly Defendants) also defend the settlement by asserting that Plaintiffs' theory of liability—which is the same for both the (b)(2) and (b)(3) classes—lacks merit. But Defendants' actions speak louder than their words: If Defendants genuinely believed that they were certain to prevail in the underlying antitrust case, why would they have agreed to pay $7.25 billion to settle it? Defendants clearly feared an adverse judgment had the case gone forward, and with good reason: Many factors—including this Court's precedent that Visa and MasterCard had market power over merchants and had, in a related context, injured competition; evidence that interchange fees are inflated and harm both merchants and consumers; and the fact that the form-over-substance corporate reorganizations of Visa and MasterCard left in place their anticompetitive rules and practices—all render the risk of loss for Defendants real and substantial. It is no surprise that courts here and abroad have repeatedly condemned Visa and MasterCard's anti-competitive rules and practices. *See infra* Section IV.

3

While Proponents characterize the (b)(2) Settlement as "textbook," it is nothing of the sort. The scope of the mandatory class is unprecedented, capturing literally millions of current and future merchants—likely the largest class of merchants ever bound in a single judgment. And the breadth of the release makes its effect akin to legislation, all but picking winners and losers, including in the emerging market for mobile payments, in ways that threaten to preserve Visa and MasterCard's market dominance virtually for all time. *See infra* Section III.

Indeed, the mandatory general release granting Defendants permanent immunity from future injunctive and damages claims on all manner of topics affords Defendants a better result than had they won at trial. Defendants purchased that immunity through a $7.25 billion payment to the (b)(3) class, without any meaningful modification of Defendants' practices to conform to the law. *See infra* Section II. For the (b)(2) class, however, rational business actors have calculated that this Settlement does not offer any relief of value, and certainly not enough relief to warrant the mandatory broad general release. It is no wonder that fully 19% of the class, measured by transaction volume, objected to the Settlement. Class action settlements rarely engender this much hostility; that a (b)(2) injunctive class settlement has faced this much opposition is unheard of. *See infra* Section V.

4

While settlements of individual cases play an essential role in our justice system, settlements of mandatory class actions at any cost can be harmful. Here, the relief is too minimal, the release too broad, and Plaintiffs' likelihood of success too great, to justify binding objectors who want nothing more than the chance to vindicate their own rights as their business needs require. This (b)(2) Settlement is emphatically *not* fair and adequate, and the district court order approving it must be reversed.

## ARGUMENT

The Merchant Trade Groups' ("MTG") initial brief ("MTG-Br.," Dkt. 973) focused exclusively on why the Settlement fails to satisfy the Rule 23(e) "fairness," "reasonableness," and "adequacy" factors established by *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*") (internal citations omitted). The MTG brief also adopted by reference the Merchant Appellants' Brief's ("MA-Br.," Dkt. 983) arguments that the Settlement violates due process, Rule 23, and public policy. Similarly, this reply brief addresses only Proponents' arguments regarding the *Grinnell* factors, and adopts by reference the arguments in the Merchant Appellants' Reply Brief ("MA-Reply," Dkt. [ ]).

5

# I. THE CASH PAYMENT CANNOT BE USED TO SUPPORT APPROVING THE (B)(2) CLASS SETTLEMENT

Proponents' justification for the (b)(2) Settlement amounts to dollars and cents: They argue that the $7.25 billion (b)(3) settlement fund excuses virtually every defect, insufficiency and burden imposed on the (b)(2) class. Plaintiffs-Appellees' Brief ("Class-Br."), Dkt. 1124, at 57-58. The suggestion that the benefits accorded to one group can justify the burdens imposed upon another fails as a matter of basic fairness and under the language of Rule 23.

Treating (b)(2) class members who are not part of the (b)(3) class, and who will not receive a dollar from the damages fund, as somehow benefitting from the damages relief, is the antithesis of "fair." The (b)(2) and (b)(3) classes have starkly different memberships: Innumerable new and not-yet-established merchants and thousands of (b)(3) opt-outs (representing over 25% of transaction volume) are members only of the (b)(2) class. Given the pace at which new merchants are created (about seven million in the last decade, *see* MA-Reply 30-31, the future merchant class members themselves may constitute the largest class ever—and their rights are curtailed by a settlement before they are even born. None of those future merchants—or the million or more new merchants who have been created since preliminary approval of the (b)(2) Settlement—will be paid from the fund.

Only the benefits that class members *actually receive* under the settlement that specifically *applies to their class* can be considered in the court's analysis of the (b)(2) Settlement. Of course, parties can seek relief for both (b)(2) and (b)(3) classes and settle as to each (assuming adequate representation, *see* MA-Reply 29-23). But in exercising its fiduciary obligation, a district court cannot approve those settlements unless each is separately fair and adequate for *each* class, particularly where, as here, the classes are highly distinct.

This class-specific focus is required by the text of Rule 23(e), which directs a reviewing court to consider the effect of the settlement on the specific Rule 23(b) certified class that it purports to bind. Thus, Rule 23(e) speaks of "*the* settlement" of "*[t]he* claims" of "*a* certified class"—all in the singular—and permits court approval only upon a finding that "*the* proposal [which] would bind class members"—again, in the singular—is fair and adequate. Fed. R. Civ. P. 23(e) (emphasis added). Indeed, under Rule 23(c)(5), if a single class is divided into subclasses, each one is to be "treated as a class under this rule." Proponents would provide lesser protection to the (b)(2) class here than to a subclass. *See, e.g., In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252-53 (2d Cir. 2011) (separately analyzing the compensation provided to each

7

subclass); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 710-11 (E.D. Pa. 2009)

(approving limited recovery to one subclass, after separately considering that

subclass's higher risk of defeat).

Proponents argue that the "resolution" as to the two settlement classes

with different memberships here must be considered "as a whole," and that the

many inadequacies in the (b)(2) Settlement are offset by the money to be paid.

Class-Br. 58 (internal citations omitted). But they cite cases which stand only for

the uncontroversial point that a court analyzing a settlement that benefits a *single*

class, whether (b)(2) or (b)(3), must consider the fairness of all of the various

*aspects* of that settlement. *Id.* (citing *Maywalt v. Parker & Parsley Petrol.*, 67

F.3d 1072, 1079 (2d Cir. 1995); *McBean v. City of N.Y.*, 233 F.R.D. 377, 382

(S.D.N.Y. 2006); *Thompson v. Metro. Life*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).

Proponents cite *no* case holding that a court can bolster the value of a settlement

offered to one class by considering the relief offered to a separate class. No such

cases exist. And the Proponents offer *no* response to the concerns that a unitary

8

analysis heightens the risk that the rights of the (b)(2) class will be compromised to increase the damages offered to the (b)(3) class.[1]  MTG-Br. 34.

Proponents' reliance on *McBean*, 233 F.R.D. at 392, is misplaced. That 2006 decision related solely to the settlement of monetary (b)(3) claims for strip searches.  While the *McBean* court *later* approved a (b)(2) settlement for injunctive relief, it did so only after holding a *separate* fairness hearing and finding that such relief, standing alone, was "fair, just, and reasonable."  *McBean*, No. 02 Civ. 5426(GEL), ECF No. 228 (S.D.N.Y. Feb. 16, 2010).[2]

Likewise, *Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013, *cert. denied* 134 S. Ct. 1941 (2014), is inapposite.  *Charron* involved a class action settlement providing damages and injunctive relief for tenants who had lived or

---

[1] Were courts permitted to offset deficiencies to one class through benefits to another, the result would be the very representational conflicts that the Supreme Court has pointed to in rejecting proposed class action settlements involving two distinct classes.  *See* MA-Br. 66-79 (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)); MA-Reply 29-32.

[2] The 2006 *McBean* decision also included injunctive relief for a separate class that underwent forced gynecological exams.  Though defendants modified their practices, the settlement permitted class members to assert damages claims for forced gynecological exams.  *McBean*, 233 F.R.D. at 381.

were living in rent-controlled apartments. There was no need to analyze the settlement's fairness to each class separately in *Charron* because: (i) there were no objections to the (substantial) injunctive relief; (ii) the release, rather than being general in nature, was limited to the claims actually litigated in the case; and (iii) the (b)(2) class members preserved their right to individual monetary relief. 731 F.3d at 251-54). An inquiry into the benefits and drawbacks of the injunctive settlement *per se* would have been academic.

As the *Charron* court recognized: "If the effect of the Settlement were that some Class Members would receive benefits, while other Class Members would exchange their rights for no benefits at all, then there would exist a conflict between subclasses that would require denial of the Settlement." 874 F. Supp. 2d at 203.[3] That is what has occurred here. None of the millions of newly-established

---

[3] Similarly, *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277 (D. Mass. 2009), *aff'd sub nom. Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30 (1st Cir. 2009), where only a single class member filed a non-moot objection, is inapposite because the (b)(2) settlement permitted opt-outs. *See* No. 05-cv-11148, ECF Nos. 270 ¶ 2 & § VII, 563-2, 563-3, 563-4, 563-5 (proposed notices to class members) (approved March 5, 2009) (D. Mass.). Moreover, the (b)(2) and (b)(3) classes had identical memberships, mitigating any risk that the (b)(3) class was benefiting at the (b)(2) class's expense. *See id.* at ECF No. 270 (class definitions).

and yet-to-be-established merchants, and none of the merchants who opted out of

the (b)(3) Settlement, will receive any benefit from the (b)(3) settlement fund.

Instead, given the limited and largely-ineffectual injunctive relief, their rights are

being extinguished for practically "no benefits at all."

## II.   THE INJUNCTIVE RELIEF PROVIDES SCANT BENEFIT TO THE (B)(2) CLASS

Proponents assert that the "heart" of the (b)(2) relief is the

Settlement's modification of the rules banning surcharging, which they

characterize as "groundbreaking" and a "sea change."  Class-Br. 60-61.  These

characterizations lack any foundation.  Though the surcharging modifications took

effect two years ago when the settlement was preliminarily approved, there is

virtually no evidence that this relief has been of any value, i.e., that merchants have

actually *used* this supposedly "groundbreaking" relief, much less that it has

effected a "sea change" in the industry.  No surprise there, as even the district court

acknowledged that "most merchants will, as a practical matter, be precluded from

surcharging Visa and MasterCard products."  SPA41.

The record contradicts Proponents' claims that the (b)(2) relief

constitutes a breakthrough.  *First*, Proponents exaggerate the significance of the

relief because the vast majority of the (b)(2) class are prohibited from surcharging. SPA41. *Second*, Proponents ignore the district court's expert's conclusion that the surcharging relief is of little to no value to merchants. *Third*, although Proponents suggest that the ban on surcharging was the focus of the case all along, in fact, the case's core concern was not surcharging *per se*, but the agreement among member banks to enforce Honor-all-Cards and default interchange rules, from which the Settlement offers no relief.

## A. The Settlement Preserves the Surcharging Ban in Crucial Ways

The Proponents misleadingly state that the Settlement "remov[es]" restraints on surcharging. Class-Br. 60. That half-truth is overwhelmed by the *new restraints* on surcharging imposed by the Settlement.

As detailed in our opening brief, the Settlement was carefully crafted to substantially *preserve* the ban in several crucial ways: (1) by inscribing in a federal-court judgment the rule that merchants cannot surcharge based on either the identity of the issuing bank or the interchange fee that bank charges, not favoring one bank over another—preserving the bank cartel; and (2) by creating a new rule—the so-called "level-playing-field" provision—that ensures that the nearly 70% of merchants that accept American Express (representing 90% of card

volume) cannot surcharge Visa or MasterCard products. *See* MTG-Br. 19-20, 55-56. Proponents' briefs ignore the first issue and, as to the second, make no mention of the district court's recognition that "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products." SPA41.

There was nothing inevitable about the so-called "American Express problem." Class-Br. 64. When class counsel and the Defendants shook hands on the "level-playing-field" provision, everyone at the table knew perfectly well that American Express's rules would prevent more than 70% of merchants from surcharging. The "level-playing-field" provision was included in the Settlement not to benefit merchants, but to "protect" Visa and MasterCard from surcharging, as MasterCard's CEO candidly admitted. MTG-Br. 55-56. This provision is especially troubling as it is facially anticompetitive. *See U.S. v. Visa*, 163 F.Supp.2d 322, 405 (S.D.N.Y. 2001) ("The Supreme Court has rejected the notion that keeping a level playing field between various competitors is a procompetitive justification for a horizontal restraint."), *aff'd* 344 F.3d 229, 234 (2d Cir. 2003).

Proponents offer no justification for the level-playing-field limitation, nor do they explain why the Settlement does not simply rescind the no-surcharging rules. That failure is especially telling given the district court's conclusions that

prohibitions against surcharging are both "anti-consumer" and "arguably irrational." SPA39.

  To all of this, Proponents have no response. Instead, they distort our arguments by claiming that we "complain that lifting prohibitions on surcharging does not guarantee that *every* merchant will begin affirmatively surcharging." Class-Br. 62 (emphasis in original). This is exactly backward: Under the (b)(2) Settlement, the vast majority of merchants are *precluded from* surcharging. In addition to the 70% of merchants accepting American Express, the 40% of merchants who operate in the 10 states prohibiting surcharging are also precluded. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995) ("that the . . . settlement benefits certain groups of the class more than others suggests that the district court did not adequately discharge its duties to safeguard the interests of the absentees").

  Proponents claim that merchants in those 10 states should be pleased because they "now face only one" obstacle to surcharging. Class-Br. 64.[4] That

---

[4] Not only have the "dominos" of other state laws prohibiting surcharging not fallen, Pl. Br. 65, but Proponents omit the fact that a federal district court recently upheld Florida's surcharging ban. *Dana's R.R. Supply v. Bondi*, 14-cv-134-RH/CAS, ECF No. 29 (N.D. Fl. Sept. 2, 2014).

claim is cold comfort to the millions of merchants for whom the surcharging "relief" is no relief at all, and whose businesses remain fully exposed to the substantial financial burdens of Visa's and MasterCard's continuing anticompetitive practices which, thanks to the (b)(2) release, they can no longer challenge. For those merchants, on whose behalf the Merchant Trade Groups speak, the Settlement changes nothing and is less than worthless.

Finally, this case is a far cry from those cases where only some members of the class might *choose* to take advantage of the injunctive relief, while others might choose not to. Unlike a case where some African-American students may elect not to participate in high school athletics, and thus not to take advantage of a desegregation order, here the vast majority of merchants are *barred*, either by state law or by contracts with third-parties, from accessing the relief, making the "relief" no more than an illusion. *Cf.* Defendants-Appellees' Brief ("Banks-Br."), Dkt. 1123, at 55 (citing *La. High Sch. Athletic Ass'n v. St. Augustine High Sch.*, 396 F.2d 224 (5th Cir. 1968) (desegregation of athletic program)).

**B.    The Court-Appointed Expert Concluded That Surcharging Is of Little Value**

Professor Sykes, the court-appointed expert, concluded that "the value of surcharging to plaintiffs is highly uncertain and may be small."  JA__{DE5965 at 43}; *see* MTG-Br. 5, 20-21, 27-28, 58, 59.  Unable to refute this conclusion, Proponents ignore it altogether, choosing to not even mention Professor Sykes's conclusion, much less to address the admissions from MasterCard's and Visa's CEOs that the Settlement's surcharging relief will have limited practical effect on their businesses.  *See* MTG-Br. 56-57; *Parker v. Time Warner Entm't Co.*, 239 F.R.D. 318, 337 (E.D.N.Y. 2007) ("[A] total lack of value exchanged for a release of claims is a strong indicator that a settlement is unfair, at least with respect to those disadvantaged members of the class.").

Instead, Plaintiffs cite their own expert, Alan Frankel, who stated that "surcharging may save merchants '$26.4 to $62.8 billion in acceptance costs over the next decade.'"  Class-Br. 62 (quoting SPA35-36).  But Dr. Frankel admitted that his numbers were merely an "illustration," not an opinion on the expected or likely result.  JA__-__ ¶ 77{DE5939-5 at 45-46} (Frankel Reply).  Professor Sykes, unsurprisingly, discounted Dr. Frankel's illustration as conjecture.  JA__{DE5965 at 39}.  *See In re Gen. Motors*, 55 F.3d at 800 (settlement unfair

16

where, *inter alia*, "district court erred when it uncritically accepted such high estimates of the settlement's value").

### C.    Proponents Overstate the Import of Surcharging Relief and Ignore the Best Possible Relief at Trial

The assertion that this case has always been about surcharging, Class-Br. 60; Banks-Br. 46-47, is contradicted by the record.  Class Plaintiffs have long maintained, correctly, that the anti-surcharging rule was one of several techniques used to reinforce and exacerbate the anticompetitive effects flowing from the two rules that are principally at issue: the Honor-all-Cards and default interchange rules.  Against that backdrop, it should come as no surprise that even a complete rescission of the no-surcharging rules—which the Settlement obviously does not achieve—would not cure the antitrust violations that were the real focus of this case.

Class Plaintiffs alleged that Defendants "restrained price competition for card acceptance services through their collusive rules and conduct, which allows them to artificially fix and maintain interchange fees."  JA__{DE1226 at 13}.  Specifically, Class Plaintiffs alleged there were four components of Visa's and MasterCard's rules and practices "that had the combined effect of

17

unreasonably restraining trade and injuring merchants": default interchange, the Honor-all-Cards rules, exclusionary rules, and the anti-steering rules (including the no-surcharge rule). SPA18-19. Rather than identifying the no-surcharge rules as the primary villain, Class Plaintiffs historically took the position that what "allowed the issuer to demand an exorbitant sum from the merchant" were the Honor-all-Cards and default interchange rules. JA__{DE1538 at 6}. The no-surcharging rules simply "compounded" merchants' inability to exert downward pressure on those fees. JA__{DE1538 at 6-7, 35}.

Class counsel's current claim that their focus was always the ban on surcharging is worse than revisionist history. It reflects a deliberate abandonment of the fundamental goal of this litigation, which was to eliminate the Honor-all-Cards and default interchange rules. Class counsel's blithe response is that settlements require each side to "give[] up a number of things." Class-Br. 70. Just so. But to fully evaluate the fairness and adequacy of the Settlement, the Court must account for what class counsel have "given up" by not litigating to trial—i.e., the "best possible recovery." *Grinnell*, 495 F.2d at 463. Here, they have not only "given up" a court-ordered injunction of Honor-all-Cards and default

18

interchange (like the rule revocation ordered in *U.S. v. Visa*, 344 F.3d at 234), they have also compelled the class to give up any claim for such relief for all time.[5]

At bottom, Proponents ask the Court to bless their settlement because, in a hypothetical world, devoid of American Express and of state anti-surcharging laws, the Settlement *might* have value to some merchants compelled into the (b)(2) class. But Rule 23 is not about the Land of Make Believe; it's about the real world. This Court should reject Proponents' other-worldly approach to the fairness analysis.

## III. THE RELEASE IS UNFAIR BECAUSE IT THREATENS COMPETITION FROM TECHNOLOGICAL INNOVATION AND GIVES DEFENDANTS MORE THAN THEY COULD RECEIVE FROM A DEFENSE VERDICT AT TRIAL

---

[5] Proponents half-heartedly claim that the other relief gives additional value to merchants. But Proponents do not dispute that buying groups and variation in acceptance practices across trade banners were already permitted. Nor do they dispute that merchants will have little negotiating leverage because the overwhelming majority of merchants remain barred from surcharging and Defendants retain the cudgel of Honor-all-Cards rules. *See* MTG-Br. 21-22 & n.15, 59-60. Similarly, the supposed benefits to the class in the form of "locking in" the Department of Justice consent decree and the Durbin Amendment are illusory, as those terms only require Defendants to abide by the law and there is no reason to believe either would be repealed before 2021. *See, e.g.*, *McClintic v. Lithia Motors, Inc.*, No. C11-859(RAJ), 2012 WL 112211, at *4 (W.D. Wash. Jan. 12, 2012) (settlement "injunction . . . is valueless" because, for example, it "merely requires [defendant] to follow the law").

Proponents claim that the Settlement grants a "standard form" release that is "straightforward" and "repeatedly approved." Class-Br. 3, 24, 53, 72, 74. But they cite no case that binds class members to a *general release* of both all injunctive claims and all ongoing and future damages claims, without also affording those class members an opportunity to opt-out. While every settling defendant yearns for "litigation peace," Visa and MasterCard have the chutzpah to demand such a release on a mandatory class-wide basis, giving Defendants greater protection from future lawsuits than they could ever have obtained had they litigated this case to judgment. The number of merchants harmed by this release— literally millions—is unprecedented.

There should be little dispute about the breadth of the release, given its plain text. All damages claims that have accrued since November 2012 and all future damages claims are released. MTG-Br. 22-24. All claims concerning Visa and MasterCard's entire rulebooks and conduct are released, including rules and conduct far removed from the rules at issue in this lawsuit. *Id*. The release goes far beyond the "identical factual predicate" doctrine: It bars claims arising from new "substantially similar" rules and conduct as well as from the "future effects" of existing rules and conduct, a concern repeatedly raised in our opening brief and

unanswered by Proponents.  MTG-Br. 23, 51-54; *see also* MA-Reply 41.  A

release of claims arising from "future effects" is particularly troubling in an

antitrust case, where the legality of challenged conduct is typically based on its

effects—i.e., whether, on balance, they are anti- or pro-competitive based on ever-

changing market circumstances.  MTG-Br. 46.  Even if this Court were to find the

proposed release legally permissible—and the Merchants Appellants' briefing

shows it is not—the staggering breadth of the mandatory release (when balanced

against the minimal relief) demonstrates that this Settlement is unfair.

    Here, the prospective release of "future effects" claims is of particular

concern, given the technological changes now underway.  The smartphone is being

used to create "new ways to pay,"[6] threatening the Defendants' market power over

electronic payments.  Though mobile payments were never an issue in this case,

Defendants crafted the release so they would be able to claim it covers their efforts

to dominate mobile payment technologies.  *See* MTG-Br. 23 (claiming release

---

[6] *See, e.g.*, Mike Isaac, *As Apple Pay Arrives, Witnessing the Next Step in Money. Maybe.*, http://www.nytimes.com/2014/10/21/technology/as-apple-pay-arrives-witnessing-the-next-step-in-money-maybe.html, N.Y. Times, Oct. 20, 2014 ("Think of Apple Pay as taking the card out of credit card.").

applies to "Google Glass"). Thus, Visa and MasterCard can use their Honor-all-Cards rules to require merchants who accept their traditional products to also accept their proprietary mobile-payment products—and thereafter claim immunity because the release covers "future effects" of the Honor-all-Cards rules. JA__-__ ¶ 24{DE2464}. Had this settlement been in effect before *In re Visa Check/MasterMoney Antitrust Litigation*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005) ("*Visa Check*") was filed, Defendants' tie of debit card acceptance to credit acceptance would have been immune from merchant lawsuits. *See* MTG-Br. 15. For this reason, the (b)(2) Settlement "raises a danger of adverse, unintended consequences in a technologically dynamic industry," as Professor Sykes warned. *Id.* at 23-24.

Like the district court, Proponents ignore this threat altogether. This Court should not follow suit. A settlement specifically designed to protect Defendants' power to stunt the development of future competitive technologies and cutting-edge business models—even as alternatives that might benefit merchants and lower costs for all are emerging—is simply not fair.

Moreover, the mandatory general release set forth in the Settlement grants Defendants far more "litigation peace" than Defendants could have obtained had they successfully litigated this case to verdict. Even under Defendants' erroneous view of the merits, the Settlement should be rejected as unfair because the release it foists on the class is broader than the preclusive effect of a trial verdict in Defendants' favor. As a result, (b)(2) class members are left in a *worse* position than had the Class tried the case and lost.

The preclusion landscape is clear: Claim preclusion does not bar new antitrust lawsuits based on continuing conduct, because each time a defendant enforces an anti-competitive rule, a new claim arises. *See* MTG-Br. 52 & n.36. The claim preclusive effects of a case litigated to judgment by a mandatory injunctive class are more narrow still: "[A] class action seeking *only declaratory or injunctive relief* does not bar subsequent individual suits for damages." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114-115 (E.D.N.Y. 2012) (collecting cases) (emphasis added; internal citations omitted). And issue preclusion does not bar a second challenge where changed factual circumstances permit the assertion of a distinct claim. *See* MTG-Br. 52-53 & n. 37.

If this case were tried to a defense verdict, (b)(2) class members would only be barred from initiating a new *injunctive* proceeding *on the issues actually decided at trial*. That bar would last only so long as the facts *remained constant*. *Cf.* Banks-Br. 48-49. Here, any trial would address only the issues and rules raised in this lawsuit—not any "substantially similar" future rule, not "any *other* [Visa or MasterCard] Rule," and not claims concerning "future effects," all of which the Settlement purports to release, *see* MTG-Br. 22-23. And issue preclusion would only prevent re-litigation of issues *actually decided*. So, for example, because Visa's Fixed Acquirer Network Fee ("FANF") was not implemented until after discovery in this case was completed and was never challenged by Class Plaintiffs, if this case were litigated to judgment, issue preclusion would not bar a subsequent suit challenging the FANF. Restatement (Second) of Judgments § 27 cmt c. (1982). Yet Proponents claim the Settlement releases damages claims based on the FANF's anticompetitive effects.

Even as to the conduct that would be challenged at trial, issue preclusion would not bar a subsequent action where a party "can establish changed circumstances occurring in the time between the two [actions]." *Id.*; *see also Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 465 (3d Cir. 1997) (second

24

environmental suit permitted several months after first was dismissed, based on additional evidence of harm to endangered species); MTG-Br. 53 & n. 37 (citing 18 Charles Alan Wright, Arthur K. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisprudence* § 4417, at 426 (2d ed. 2002) (issue preclusion inapplicable where there are "new facts in any way distinguishable")).  While such changed circumstances may not occur immediately, this release is permanent, potentially barring new challenges to Honor-all-Cards rules even as Honor-all-Cards rules cause further injury and "future effects" (i.e., "changed circumstances") and impede the development of new payment technologies to compete with Visa and MasterCard.

The capstone of unfairness is that the release is *mandatory*.[7]  Even the most sophisticated merchant is deprived of the right to decide for itself whether the modification of the surcharging ban is sufficient to justify granting this release. Rule 23(b)(2) class members are bound to an unwanted release that deprives them of the potential benefits of technological innovations and strips them of potential

---

[7] Significantly, both cases Proponents cite, *In re Literary Works*, 654 F.3d at 247-48, and *Visa Check*, 396 F.3d at122, provided class members the opportunity to opt-out.

claims that even a loser at trial would retain.   This is the very definition of unfairness.

## IV.   THE MERCHANTS' ANTITRUST CLAIMS ARE STRONG

Defendants claim "that the Class Plaintiffs' position at the moment of settlement was precarious" and that "Plaintiffs faced serious odds of complete failure."  Banks-Br. 28, 29.  But their claims about the weaknesses of the case ring hollow against the backdrop of the "historic sum" they are willing to pay.  Class-Br. 57.  Put differently, if the merchants' case were on the precipice of complete defeat, why would Defendants agree to pay $7.25 billion to the (b)(3) class? Clearly, the risk of a Plaintiffs' verdict here was real.

### A.   The IPOs Kept the Horizontal Restraints in Place

Defendants argue that, even if they were combinations or conspiracies pursuant to Sherman Act § 1 when this case was filed—as this Court held in *U.S. v. Visa*—their subsequent corporate reorganizations immunized them from antitrust liability.

As detailed in our opening brief, the Supreme Court has rejected this form-over-substance approach to antitrust law.  *See* MTG-Br. 49 (citing *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191, 195-96 (2010)).  Here, the Visa and

26

MasterCard reorganizations were expressly conditioned on the promise that the networks' conduct would not change, even as their corporate forms did. In every relevant respect, this has proven to be true, as Defendants do not dispute: Honor-all-Cards and default-interchange rules remain in place; interchange fees have continued to rise; and banks still do not compete for merchants. MTG-Br. 15-16.

Even the district court recognized, after final approval in this case and in denying Defendants' motion to dismiss the opt-out plaintiffs' complaints, "that the allegations that the defendants didn't withdraw from the illegal concerted activity and that the IPO's left intact anticompetitive restraints plausibly allege a violation of the antitrust laws." JA __{Trans. 53}.

**B.** **Defendants Ignore Critical Inquiries Under the Rule-of-Reason**

MTGs' opening brief faults the district court for failing even to mention Defendants' market power and the anti-competitive effects of their agreements not to compete, thus "skipping the first two parts [of the rule-of-reason inquiry] in the antitrust analysis." MTG-Br. 38. Defendants too are silent on these fundamental issues.

As an initial matter, Defendants ignore both that (1) in 2003, this Court in *U.S. v. Visa*, 344 F.3d at 239, held that Visa and MasterCard had

substantial market power over merchants, i.e., "power to control prices or exclude competition"; and (2) in 2010, the Department of Justice concluded that Visa and MasterCard's market power over merchants had continued unabated, MTG-Br. 39 n.26. These determinations are critical because "market power bears a particularly strong relationship to a party's ability to injure competition." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993).

Sidestepping these findings—which span a decade and cover much of the damages period—Defendants instead rely on *National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986) ("*NaBanco*"). *NaBanco* upheld the 1984 determination that "VISA does not possess market power in th[e relevant] market." *Id.* at 605. That decision was rendered in a pre-internet world where merchants used carbon paper (not swipes) to accept credit cards. That world bears no resemblance to the electronic payments market that this Court addressed in its 2003 *U.S. v. Visa* ruling, when it implicitly overrode *NaBanco*'s market power determination.

Defendants also do not dispute that Visa and MasterCard "set default interchange rates at levels significantly higher than would prevail in a competitive

28

market," and continue to raise fees even as processing costs have decreased. MTG-Br. 11. The harm to merchants and merchants' customers—consumers— from these supra-competitive and rising fees is real. Yet Defendants make no mention of these patently anticompetitive effects.

Perhaps most cynical is Defendants' attempt to pit merchants against consumers. Having all but conceded that merchants suffer from Defendants' anticompetitive rules and rising interchange rates, they argue that such harm should be ignored because consumers benefit from universal card acceptance. In fact, however, merchants' and consumers' interests are aligned.

The suggestion that ordinary consumers are not harmed by supra-competitive interchange rates is just plain wrong. Billions of dollars in inflated interchange fees lead to higher prices at checkout—prices that all consumers pay (including cash customers who receive none of the alleged benefits of universal card acceptance). *See U.S. v. Visa*, 163 F. Supp. 2d at 396 ("merchants—and ultimately consumers—have an interest in the vigor of competition to ensure that interchange pricing points are established competitively"). Moreover, Defendants' claims about the value of Honor-all-Cards rules at a time when payment cards were in their incipient stages and consumers were learning how to use them are beside

29

the point.  Whether Honor-all-Cards rules may have been necessary in the *Mad*

*Men* era, circa 1966, when Visa and MasterCard were first formed, says nothing

about the rules' competitive effects and legality today.[8]

Defendants' claimed pro-competitive effects are also not recognized

as legitimate under antitrust law, which bars justifying anticompetitive harm in one

market—merchants' purchase of payment-network services—by benefits bestowed

upon another market—consumers' use of credit cards.  MTG-Br. 42 (citing *U.S. v.*

*Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)).  Defendants' efforts to pit

merchants against consumers run afoul of *Topco*.  Without the anticompetitive

rules the Settlement enshrines for all time, markets and competition would

determine a payment system that balances the desires of consumers, the interests of

merchants, and the profit objectives of banks.  The resulting system would

inevitably be preferable to the rigidly anticompetitive world locked into place

forever by the overbroad (b)(2) Settlement.

---

[8] Defendants also seek to justify supra-competitive fees by claiming there was increased "network output."  Banks-Br. 36.   But increased sales often reflect anticompetitive conduct, rather than justify it.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 66-67 (D.C. Cir. 2001).

Tellingly, Defendants' brief omits any reference to MasterCard's recent loss in Europe on these very same antitrust claims—the only decision to address the merits of these claims anywhere in the world. Applying similar antitrust standards to the same essential facts, the European Commission, in a decision upheld by Europe's highest court, the Court of Justice, rejected virtually all the arguments Defendants advance in this litigation, including: that the IPOs eliminated the pre-existing conspiracy; that high interchange fees benefit consumers; and that there is no plausible but-for world. JA__-__{C-382/12 P, 9/11/14)}; *see also* MTG-Br. 56-57.

The European decision is but the latest example of courts and antitrust enforcers condemning Visa's and MasterCard's practices. That list includes the Department of Justice's recent enforcement action against Visa and MasterCard, the decision by this Court in *U.S. v. Visa* to affirm the rescission of the exclusionary rules, and the decision by this Court to approve the $3 billion settlement in *Visa Check* that rescinded the credit/debit Honor-all-Cards tying arrangement. This Court should consider this long history of successful antitrust litigation against Visa and MasterCard, along with the "historic" $7.25 billion

payment, when assessing the credibility of Defendants' claim that the Plaintiffs' case was facing certain defeat.

### C. *Illinois Brick* Is Irrelevant to the Class's Injunctive Claims

Defendants continue to focus on *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which bars the recovery of damages by indirect purchasers under antitrust law. But *Illinois Brick* has no role in analyzing the (b)(2) class's chances of establishing liability (the fourth *Grinnell* factor) or obtaining injunctive relief. Because *Illinois Brick* is relevant only to *damages*, *see* MTG-Br. 35 n.23, it is irrelevant to whether the (b)(2) class can prove Defendants violated antitrust laws, warranting an injunction.

Defendants implausibly argue that, even if *Illinois Brick* is irrelevant to any trial on the injunctive claims, it still is relevant to the fairness analysis because *Illinois Brick* would bar damages anyway, and thus the (b)(2) release is not onerous in that respect. This is too clever by half. If *Illinois Brick* barred damages in this case (it does not[9]), one would expect the (b)(3) class to receive

---

[9] In fact, the district court rejected Defendants' assertion that the damages claims were barred by *Illinois Brick* when it denied Defendants' motions to dismiss the opt-out plaintiffs' complaints. JA__{Trans. 18, 21-25, 54}.

little to no settlement relief, while the (b)(2) class would receive superior relief because their injunctive claims are unaffected by *Illinois Brick*. That the *opposite* occurred highlights both the bankruptcy of Defendants' *Illinois Brick* argument and the skewed nature of this Settlement.

## V. THE OPPOSITION TO THE SETTLEMENT FROM THE TRAPPED CLASS IS EXTRAORDINARY

Proponents gloss over the fact that the reaction of the class to this Settlement was both extraordinary and negative. *Cf. Visa Check*, 396 F.3d at 119 ("favorable reaction" was "perhaps the most significant factor in our *Grinnell* inquiry").

There is no dispute about the extent of the displeasure: By volume, more than 25% percent of merchants opted-out of the (b)(3) Settlement and at least 19% objected to the (b)(2) Settlement; 10 of the 19 class representatives objected, including all six trade associations that had sued seeking injunctive relief on behalf of their thousands of members[10]; and no merchant—not one—uninvolved in the settlement negotiations voiced support for the Settlement.

---

[10] Proponents misstate the record in denying that Class Counsel "fired their clients" and claiming those trade-association Plaintiffs "agreed to the mediators' settlement proposal" but then "reversed course." Class-Br. 13, 49 n.7. The record reflects that those associations expressed

33

Rather than dispute that this reaction stands in stark contrast to the apathetic response to virtually all class action settlements, particularly *injunctive* class settlements, Proponents instead highlight that, in raw numbers, only .05% objected. This is hardly surprising considering that the vast majority of the 12 million current members of the class are small merchants more focused on running their businesses than reading class action notices and filing objections. But Proponents cannot have it both ways. As set forth in the Settlement, the metric chosen by Proponents to measure disapproval was merchant transaction volume. *See* JA__ ¶¶ 18, 19, 97{DE1588-1}. It is this same metric that yields a *19%* objection rate.

The widespread dissatisfaction by sophisticated businesses that cannot exclude themselves from the Settlement counsels strongly against approval. The objecting merchants are saying: "We want out of this deal." This Court should grant their request.

---

grave concerns about the proposal, but agreed to negotiate under the process the mediator suggested to have a seat at the negotiating table. When Class Counsel nonetheless agreed to a final settlement which contained those objectionable terms, the trade associations objected. JA__ ¶ 13, 15{DE6006-1}; JA__ ¶ 11-20{DE2561}.

## CONCLUSION

For the reasons stated above and in our opening brief, this Court

should reverse.


Dated:      November 25, 2014
            New York, New York

                              EMERY CELLI BRINCKERHOFF
                              & ABADY LLP


                              _____/s/_____
                              Andrew G. Celli, Jr.
                              Debra L. Greenberger
                              600 Fifth Ave, 10th Floor
                              New York, New York 10020
                              (212) 763-5000

                              Attorneys for Objectors-Appellants
                              NRF and RILA

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:          November 25, 2014
                New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP


                                        _____/s/_____

                                        Andrew G. Celli, Jr.
                                        Debra L. Greenberger
                                        600 Fifth Ave, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        Attorneys for Objectors-Appellants
                                        NRF and RILA