# PAGE PROOF

# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON), 13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON), 14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON), 14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON), 14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON), 14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON), 14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON), 14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON), 14-663-cv(CON), 14-837-cv(CON)**

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of New York*

## JOINT PAGE-PROOF REPLY BRIEF FOR OBJECTORS-APPELLANTS AND PLAINTIFFS-APPELLANTS (MERCHANT APPELLANTS' JOINT REPLY BRIEF)

Stephen R. Neuwirth*
Sanford I. Weisburst
Steig D. Olson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212-849-7000

Jeffrey I. Shinder†
Gary J. Malone
A. Owen Glist
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

Thomas C. Goldstein*†‡
Eric F. Citron
GOLDSTEIN & RUSSELL P.C.
5225 Wisconsin Avenue, N.W., Suite 404
Washington, D.C. 20015
202-362-0636

Michael J. Canter‡
Robert N. Webner
Kenneth J. Rubin
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
614-464-6327

Gregory A. Clarick‡
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, New York 10001
212-633-4310

*(Parties listed on inside cover)*

*Attorneys for Objector-Appellant
  Home Depot U.S.A., Inc.

†Attorneys for Plaintiffs-Appellants
  Coborn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC;
  Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience
  Stores (NACS); National Community Pharmacists Association (NCPA);
  National Cooperative Grocers Association (NCGA); National Grocers
  Association (NGA); National Restaurant Association (NRA); and NATSO Inc.;

And Objectors-Appellants
  7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors; Aldo US Inc. d/b/a Aldo
  and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.; American Eagle
  Outfitters, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC;
  Best Buy Stores, L.P.; BJ's Wholesale Club, Inc.; The William Carter Company (Carter's);
  Costco Wholesale Corporation; Crate & Barrel Holdings, Inc.; Darden Restaurants, Inc.;
  David's Bridal, Inc., DBD Inc. and David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.;
  Dillard's, Inc.; Family Dollar Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.;
  Gap Inc.; GNC Holdings, Inc. (General Nutrition Corporation); Genesco Inc.;
  The Gymboree Corporation; HMSHost Corporation; IKEA North America Services, LLC;
  J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon Petroleum LP;
  Martin's Super Markets, Inc.; Michaels Stores, Inc.; National Railroad Passenger
  Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant Group, Inc.;
  Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal Supplies, Inc.;
  PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI);
  Roundy's Supermarkets, Inc. d/b/a Pick 'N Save, Rainbow, Copps, Metro Market and
  Mariano's; Sears Holdings Corporation; Speedway LLC; Starbucks Corporation;
  Stein Mart, Inc.; Thermo Fisher Scientific Inc.; The Wendy's Company; The Wet Seal, Inc.;
  Whole Foods Market, Inc.; Zappos.com, Inc.; Fleet Wholesale Supply Co., Inc.;
  Mills Motor, Inc.; Mills Auto Enterprises, Inc.; Willmar Motors, LLC; Mills Auto Center, Inc.;
  Fleet and Farm of Alexandria, Inc.; Fleet Wholesale Supply of Fergus Falls, Inc.; Fleet and
  Farm of Green Bay, Inc.; Fleet and Farm of Menomonie, Inc.; Mills Fleet Farm, Inc.;
  Fleet and Farm of Manitowoc, Inc.; Fleet and Farm of Plymouth, Inc.; Fleet and Farm
  Supply Company of West Bend, Inc.; Fleet and Farm of Waupaca, Inc.; Mills E-Commerce
  Enterprises, Inc.; Brainerd Lively Auto, LLC; Ashley Furniture Industries Inc.; Beall's, Inc.;
  Boscov's, Inc.; The Buckle, Inc.; Buc-ee's Ltd.; The Children's Place Retail Stores, Inc.;
  Cracker Barrel Old Country Store, Inc.; Cumberland Farms, Inc.; Express, LLC;
  Family Express Corporation; New York & Company, Inc.; Republic Services, Inc.;
  Swarovski U.S. Holding Limited; The Talbots, Inc.

‡Attorneys for Objectors-Appellants
  Target Corporation; Macy's, Inc.; Kohl's Corporation; The TJX Companies, Inc.;
  Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.;
  Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.;
  Ascena Retail Group, Inc.; Abercrombie & Fitch Co.; OfficeMax Incorporated;
  Saks Incorporated; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.;
  Luxottica U.S. Holdings Corp. and American Signature, Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................3

I.     The Settlement Impermissibly Extinguishes Individualized Claims
With No Opt-Out Right ...................................................................3

      A.     Proponents Obscure The Settlement's Effects. ....................................3

      B.     The Settlement Cannot Extinguish Individualized *Claims*
Without Opt-Out Rights, Regardless Of The Relief Sought ...............5

      C.     The Settlement Cannot Extinguish Individualized Claims,
Whether Past, Present, Or Future. ..........................................8

      D.     Proponents Elide The Critical Distinction Between Class
Litigation And Settlement. ...................................................12

II.     The (b)(2) Class Is Not Cohesive .................................................18

      A.     Rule 23(b)(2) Requires Cohesion With Respect To All
Extinguished Claims. ..........................................................19

      B.     As State-Law Surcharging Bans Demonstrate, The (b)(2) Class
Is Non-Cohesive. ................................................................22

      C.     The Settlement Relief Is Divisible. .......................................26

III.     One Set Of Lawyers And Class Representatives Could Not
Adequately Represent Both Classes .............................................27

      A.     Third-Party Supervision Does Not Substitute For Independent
Representation. ..................................................................28

      B.     Classes With Overlapping Membership Still Require
Independent Representation. .................................................29

      C.     The Trade-Offs Between Prospective And Monetary Relief Are
Obvious. ..........................................................................32

i

IV.  The (b)(2) Release Exceeds Its Permissible Scope ......................................38

    A.  The Release Impermissibly Waives Future Antitrust Claims.............38

    B.  The Release Otherwise Exceeds The Court's Power..........................40

CONCLUSION ...........................................................................................44

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re AIG Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ........................................................................24

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ........................................ 8, 12, 13, 18, 19, 20, 27, 31, 32, 37

*Authors Guild v. Google, Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ......................................................18, 43

*Cooper v. Fed. Reserve Bank of Richmond*,
  467 U.S. 867 (1984) ...................................................................................15

*Dana's R.R. Supply v. Bondi*,
  No. 14-134 (N.D. Fla. Sept. 2, 2014) ..........................................................24

*Eubank v. Pella*,
  753 F.3d 718 (7th Cir. 2014) ......................................................................29

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) .......................................................................19

*In re Gen. Motors Engine Interchange Litig.*,
  594 F.2d 1106 (7th Cir. 1979) ....................................................................14

*Gooch v. Life Investors Insurance Co.*,
  672 F.3d 402 (6th Cir. 2012) ......................................................................35

*Halliburton v. Erica P. John Fund*,
  134 S. Ct. 2398 (2014) ...............................................................................20

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ......................................................................21

*Jefferson v. Ingersoll Intern. Inc.*,
  195 F.3d 894 (7th Cir. 1999) ......................................................................15

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000) .......................................................................11

*Johnson v. Meriter Health Plan*,
  702 F.3d 364 (7th Cir. 2012) ......................................................................35

*In re Joint E. and S. Dist. Asbestos Litig.*,
  982 F.2d 721 (2d Cir. 1992) ...................................................................27, 37

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955) ...................................................................15, 16, 39, 41

*In re Literary Works*,
654 F.3d 242 (2d Cir. 2011) ........... 11, 13, 14, 18, 27, 28, 29, 31, 32, 33, 34, 37

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................ 25

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ................................................ 11

*In re Microsoft Corp. Antitrust Litig.*,
214 F.R.D. 371 (D. Md. 2003) ............................................ 37

*N.Y. Cent. R.R. v. White*,
243 U.S. 188 (1917) ............................................................. 8

*National Super Spuds v. N.Y. Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981) .................................................... 43

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ............................ 8, 9, 10, 13, 18, 19, 20, 21, 25, 31, 33, 37

*Richardson v. L'Oreal USA*,
991 F. Supp. 2d 181 (D.D.C. 2013) ...................................... 7

*Robinson v. Metro-North Commuter R.R.*,
267 F.3d 147 (2d Cir. 2001) ................................................ 19

*Schwartz v. Dallas Cowboys Football Club*,
157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................... 39, 40

*Seijas v. Argentina*,
606 F.3d 53 (2d Cir. 2010) .................................................. 36

*Stephenson v. Dow Chemical*,
273 F.3d 249 (2d Cir. 2001) ............................................. 9, 10

*In re Visa Check/MasterMoney Antitrust Litigation*,
280 F.3d 124 (2d Cir. 2001) ........................................ 1, 2, 13, 30

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012) ...................................... 16, 36

*Wal-Mart Stores v. Dukes*,
131 S. Ct. 2541 (2011) ...................... 3, 5, 6, 7, 13, 15, 19, 20, 22, 26

*Wal-Mart Stores v. Visa U.S.A.*,
396 F.3d 96 (2d Cir. 2005) .................................................. 31

## Statutes and Rules

Fed. R. Civ. P. 23(a) .......................................................... 22

Fed. R. Civ. P. 23(b) ..................................................... passim

## **<u>Miscellaneous</u>**

2 *Newberg on Class Actions* § 6:15 (4th ed. 2002) ...................................................22

2 *Newberg on Class Actions* § 4:32-34 (5th ed. 2012) ...........................................22

*Developments in the Law, Class Actions*, 89 Harv. L. Rev. 1318 (1976) ..............14

# INTRODUCTION

At its core, this settlement embodies a set of overlapping and fatal violations of class-action and constitutional law.  First, it extinguishes the individualized claims of objecting and future merchants on a mandatory basis—immunizing thousands of defendants' practices from suit, regardless of the individualized legal harms class members will suffer and their due-process right to challenge them. Second, it uses Rule 23(b)(2) to bind a sprawling, diverse class and thereby extinguish all possible claims about all of defendants' conduct—in exchange for narrow relief foreclosed to many class members by law.  Third, it was formulated while this vast (b)(2) class had the same representation as a distinct (b)(3) class simultaneously releasing the same claims—providing no protection to ensure that the millions of claims extinguished in the (b)(2) settlement were not traded for the billions of dollars given to that (b)(3) class.  And, finally, it uses an unprecedented release to eliminate future antitrust suits and other claims that lie well beyond the permissible scope of this (or any) class-action case.

Proponents say that this is all "textbook," but they cannot find a precedent approving any one of these features, let alone all of them at once.

Of course, there was a precedent proponents could have followed.  *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 147 (2d Cir. 2001), certified a similar class of merchants to pursue a *narrow* set of claims on an *opt-out*

basis, in substantial part to avoid the Rule 23 and due-process violations that arise here.  Yet *Visa Check* still successfully settled, providing both monetary and injunctive relief for its single (b)(3) class.  Following that course here would have provided a path to settlement, given proponents much of what they wanted, and protected the rights of absent and objecting class members.

But these parties wanted more.  Defendants wanted to buy "global peace"—to pay billions now for the right to continue 99.9% of their business as usual, free from future threats of litigation.  They wanted that peace to sweep away the claims of every possible plaintiff regarding practices not even at issue in this case, including plaintiffs who would not benefit from the deal or want to sign on.  Class counsel—with a life-changing claim on the (b)(3) fund—agreed.  And those who disagreed were ignored, including all six trade-association plaintiffs, whose predominating focus on the going-forward terms for the (b)(2) class led them to vote no (and then get dropped as class representatives).

Ultimately, no class-action settlement can accomplish what proponents wanted:  Individualized claims belong to individual class members and cannot be extinguished without their consent.  But equally important, an agreement on this result was only possible because proponents ignored the most basic protections of the federal rules in reaching it.  A cohesive (b)(2) class would not have agreed to release all future claims against defendants in exchange for surcharging relief that

many members cannot use. An independent (b)(2) representative would not have agreed to the massive mismatch between the paltry (b)(2) relief and the sweeping (b)(2) release—a boon to defendants that only the billions for the (b)(3) class could buy. Proponents want to convert these into deferential questions of substantive fairness, but they are not. At bottom, this settlement involved *using* the (b)(2) class as a tool for stripping absent class members of their individualized rights—not *representing* them—and that basic procedural abuse led to a result at odds with Rule 23 and due process of law.

## ARGUMENT

### I. The Settlement Impermissibly Extinguishes Individualized Claims With No Opt-Out Right

#### A. Proponents Obscure The Settlement's Effects.

The (b)(2) settlement extinguishes merchants' right to challenge all of defendants' thousands of rules and practices in the future. Class members have thus been deprived—over objection and with no opt-out right—of their ability to obtain either damages for any of that conduct after November 2012, or an injunction stopping any individual harms they will suffer. The settlement thus achieves exactly what *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541 (2011), forbids: Individualized claims of objecting class members are "*precluded* by litigation they had no power to hold themselves apart from." *Id*. at 2559; Merchant-Appellants' Brief ("MA-Br."), Dkt. 983, at 32-43. Surprisingly, proponents do not mention

this language once, though it represents the motivating concern behind the Supreme Court's unanimous holding abrogating many of the (b)(2) cases they cite. *See, e.g.*, Plaintiffs-Appellees' Brief ("Class-Br."), Dkt. 1124, at 42 (citing exclusively pre-*Dukes* cases for proposition that (b)(2) settlements can release future claims).[1]

Instead, proponents argue that the settlement did not mandatorily extinguish individualized claims because (b)(3) class members could opt out with respect to *retrospective* damages. Accordingly, they denigrate all the current and future damages claims they have extinguished as "hypothetical" or "inchoate" claims against "injunction-modified" conduct. Class-Br. 43-44; Defendants-Appellees' Brief ("Banks-Br."), Dkt. 1123, at 63. This is hand-waving, and the illusion is dispelled by examining how proponents' supposed opt-out right actually works.

Consider class members like Amazon and Target, which have filed opt-out suits. If they prevail, and prove that the Honor-All-Cards rule (for example) is anticompetitive, they will get damages through November 2012. The settlement forecloses recovery for damages between that date and the judgment, however, as well as any effort to actually *stop* defendants from enforcing the (unlawful) rule or to recover damages suffered in the future. Having proven individualized claims

---

[1]     Moreover, the few pre-*Dukes*, out-of-circuit cases proponents cite did not expressly consider the due-process argument at issue. As proponents acknowledge, before *Dukes*, many courts failed to even "address the released claims" in their "(b)(2) certification cases." Class-Br. 42.

against the Honor-All-Cards rule, these plaintiffs will be forced to continue honoring all cards, and will obtain nothing to recompense their individualized, ongoing, and not-at-all inchoate harms. Why? Because—in violation of Rule 23 and due process—their claims have been "*precluded* by litigation they had no power to hold themselves apart from." *Dukes*, 131 S. Ct. at 2559.

Nor are these claims against "injunction-modified" conduct that Amazon or Target have conceded is lawful or "deliberately left in place." Class-Br. 44; Banks-Br. 2, 57. These are claims against conduct that defendants will not modify at all, left in place only by the mandatory settlement from which Amazon, Target, and hundreds of others seek *only* the right to opt out. Indeed, the choice to litigate and not leave that conduct in place is all they want to preserve.

Proponents offer no precedent for anything resembling this procedure, and its novelty should not be understated. Rule 23(b)(2) was meant for the rare cases where class members should have no need for notice or *desire* to opt out. *Dukes*, 131 S. Ct. at 2558-59. Here, it was used as a tool to silence class members seeking only the opt-out right that could protect them from future individualized harms.

## B. The Settlement Cannot Extinguish Individualized *Claims* Without Opt-Out Rights, Regardless Of The Relief Sought.

Objectors' brief explained that Rule 23 and the Due Process Clause look to the *claims extinguished*, not merely the relief sought or obtained by class plaintiffs. MA-Br. 32-37, 44-46. Like the district court, however, proponents argue that the

released claims are irrelevant, and that certification of their mandatory (b)(2) settlement class was lawful because the class sought and obtained only injunctive relief. *E.g.*, Banks-Br. 51-52 ("the propriety of (b)(2) certification does not turn on the nature of the claims released"); Class-Br. 40-41 (same). This cannot be the rule.

First, it makes no sense. Due process rights—including notice and opt-out—do not protect absentees from what they would *gain* by settlement, but rather from what they would *give up*. The property right protected by due process is the claim—the "chose in action." MA-Br. 32. Accordingly, the animating concern in *Dukes* was that individualized claims for monetary relief that were *not even brought* in a (b)(2) class case might end up precluded. *See* 131 S. Ct. at 2559. *Dukes* held that a litigation class that merely "created the possibility" of precluding plaintiffs' individualized claims would violate Rule 23(b)(2). *Id.* A release that expressly extends to all future claims for damages or individualized injunctive relief does not just create that possibility, it necessarily produces the impermissible result.

Proponents' rule also enables the very manipulation *Dukes* forbids. *Dukes* rejected the argument that Rule 23(b)(3)'s procedural protections were inapplicable "whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction." *Id.* It also warned

against allowing class counsel to adopt a strategy of asserting only injunctive claims in order to obtain a certification that could then have preclusive effects over damages claims as well.  *Id.*  Yet proponents contend that, so long as they seek only injunctive relief for the (b)(2) class, they can preclude individualized claims—including future damages claims—on a mandatory basis in their settlement.  This is backwards; the whole point of *Dukes* is that counsel's own choices cannot provide such preclusive power over a mandatory class.  *Id.*; *see Richardson v. L'Oreal USA*, 991 F. Supp. 2d 181, 199 (D.D.C. 2013) (rejecting (b)(2) settlement "omitting damages claims from the complaint but agreeing to release damages claims on a class-wide basis" because that "is tantamount to asserting damages claims but agreeing to compromise them for nothing" and "[e]ither way, absent class members will be precluded from bringing a class action for damages in the future, all without … the chance to opt out").

Proponents try to confuse *Dukes*'s teaching by pulling out micro-quotations referring to the "relief sought."  Class-Br. 41; Banks-Br. 52.[2]  In *Dukes*, of course, there was no settlement, so the Court had no reason to discuss any release of claims.  But if *Dukes* had involved a settlement, even greater scrutiny would have been necessary.  *Contra* Banks-Br. 60-62; Class-Br. 40-43.  As the Supreme Court has repeatedly held, "[w]hen a district court, as here, certifies [a mandatory class]

_____

[2]     Notably, defendants quote portions of *Dukes* that are not even about (b)(2).  Banks-Br. 52 (citing *Dukes*'s commonality discussion under Rule 23(a)).

for class action settlement only, the moment of certification requires 'heightene[d] attention' to the justifications for binding the class members" because it is the only chance to adjust the classes and protect their absent members. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997)). Settlement only increases the opportunity to deprive such members of the individualized claims that belong to them by right; a rule that looks to the preclusive effect of litigation cannot ignore the even-more-sweeping preclusive effect of settlement releases.

## C. The Settlement Cannot Extinguish Individualized Claims, Whether Past, Present, Or Future.

Proponents also suggest that the bar against mandatory classes extinguishing individualized claims—including money-damages claims—is inapplicable to claims of *future* harm. Banks-Br. 63-65; Class-Br. 44-47. No case has ever adopted that rule, however. Proponents' sole affirmative support is the century-old dictum that no one has a property interest in a "rule of law." *N.Y. Cent. R.R. v. White*, 243 U.S. 188, 198 (1917). But objectors claim no such property right— they do not seek, as in *White*, to prevent new "legislation in the public interest." *Id.* Objectors claim only the due-process right to litigate the federal statutory claims they *do* have as they see fit; that proponents analogize their private agreement extinguishing those claims to legislation is illuminating.

8

Conversely, proponents cannot distinguish cases like *Ortiz* and *Stephenson v. Dow Chemical*, 273 F.3d 249, 261 (2d Cir. 2001). These cases hold that, when class members' individualized damages claims arise after a class-action settlement, the settlement cannot bind those class members, who had no opt-out right. *See* MA-Br. 42-43. Accordingly, they make clear that—far from excusing the release—the fact that the claims of individualized harm will arise in the future makes the settlement even more problematic. *E.g.*, *Ortiz*, 527 U.S. at 845-48.

Proponents try to cabin these cases to their precise facts, contending that they only forbid mandatorily releasing future claims arising from conduct that has *already* occurred. Banks-Br. 63-65. This narrow reading ignores *Ortiz*'s warning not to use mandatory class actions to settle future monetary claims—a warning that in no way turned upon the date of the conduct at issue.[3] Moreover, proponents' rule fails to distinguish a class-action settlement that permits *unmodified* future conduct from one that exclusively requires that the future be *changed* through a (b)(2) injunction. It is one thing to claim that "a release of hypothetical and uncertain future damages claims based on the injunction-modified, going-forward

---

[3]    *Ortiz*, which proponents ignore entirely in this context, explains that the "inherent tension between representative suits and the day-in-court ideal is only magnified if applied to damages claims gathered *in a mandatory class*." *Ortiz*, 527 U.S. at 847-48 (emphasis added). And apart from ignoring *Ortiz*, proponents try to distinguish all these cases as ones that were or "should have been" certified under (b)(3). Class-Br. 43. But *that is the question here*: whether this settlement class, too, should have been certified exclusively under (b)(3) because, as in these precedents, it extinguishes individualized claims.

conduct is an unobjectionable feature," because "the future claims 'released' may well *not exist* if the injunction works as intended."  Class-Br. 44.  But this is not a case where the foreclosed future damages claims would arise exclusively—or, even, predominantly—from conduct changed by the settlement.  Rather, the settlement *mandatorily* releases all future claims with respect to Honor-All-Cards, default interchange, Visa's Fixed-Acquirer Network Fee (FANF), and thousands of other unchanged practices in defendants' voluminous rulebooks.

Accordingly, proponents' claimed distinction between a future claim about past conduct (which they admit cannot be released) and a claim about future conduct (which they say can) evaporates.  By releasing *unmodified* conduct, this settlement ensures that at least the harms that happened in the past will happen in the future as well.  Accordingly, future and objecting class members have the same kind of individualized, future claims that could not be extinguished involuntarily in cases like *Stephenson* and *Ortiz*.  *See* MA-Br. 42-43.

Relatedly, proponents go badly astray in characterizing the released claims here as "inchoate" or "hypothetical" and thus unworthy of due-process protection. Future claims based on unmodified conduct are both readily defined and entirely predictable.  Defendants plainly attributed great value to receiving a release of these "inchoate" claims.  Ultimately, proponents seem to hypocritically treat these

future individualized claims as highly valuable property *to them*, but not to those class members that are forced to give them up.

Proponents cite cases for allowing mandatory releases of future damages claims that are no support at all. They point to *In re Literary Works*, 654 F.3d 242 (2d Cir. 2011), as their best case for allowing a "release of claims regarding future infringements" where the complaint "sought injunctive relief for future uses, and therefore contemplate[d] these alleged future injuries." Banks-Br. 57. But they ignore its critical feature: *Literary Works* was an *opt-out* settlement. MA-Br. 37.

Moreover, while proponents rely heavily on this Court's decision in *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997), approving a (b)(2) litigation class regarding New York City social services, they ignore the subsequent settlement carefully preserving class members' right to seek either "damages or equitable relief tailored solely to the specific circumstances of that individual plaintiff." *See Joel A. v. Giuliani*, 218 F.3d 132, 142 (2d Cir. 2000); MA-Br. 37. Proponents believe that settlement could have been designed very differently: By seeking only injunctive relief, the class could prospectively bless whatever parts of the New York City social-services system class counsel saw fit, subject only to deferential fairness review. Individuals who needed or desired individualized injunctive or damages relief—including unborn future wards of New York City—would have no

right to seek it, nor to claim that the ongoing conduct remained unlawful, however harmful it might be to them.

This is obviously a dangerous result that transforms class actions in every context, including civil rights. Instead of giving voice to small-value claims otherwise drowned out by litigation costs, *see Amchem*, 521 U.S. at 617, class actions become a mechanism for silencing parties with substantial, individualized harms who are actually prepared to challenge the legality of conduct that hurts them. Allowing (b)(2) class counsel to legislate the future rules for everyone through negotiations with defendants guts the individualized causes of action that Congress provided and eliminates absent class members' due-process rights to protect themselves.

### D. Proponents Elide The Critical Distinction Between Class Litigation And Settlement.

Throughout their briefs, proponents ignore the unique issues at stake in class-action settlement. The fundamental flaw is uncritically applying principles from *litigation* (and, often, *bilateral* litigation) in this very different context. Proponents thus argue that courts should approve class-action settlements that extinguish individualized future monetary claims—without opt-out rights— because unless defendants can extinguish by mandatory settlement every claim that would be extinguished in an unsuccessful bilateral litigation, (b)(2) classes will be forced to go to trial. Class-Br. 44-46. This argument relies on a mistaken policy

intuition that global settlement is the paramount goal of any class action—a view

directly at odds with cases like *Amchem*, *Ortiz*, and *Dukes*, which treat the rights of

absent class members as inviolable.  But this is also a false dichotomy:  As cases

like *Literary Works* and *Visa Check* show, it is entirely possible to settle class

actions while avoiding the concerns presented here by simply granting objecting

class members the right to opt out.  Accordingly, neither established class-action

law nor judicial policy favors proponents' conflation of litigation and settlement.

Initially, proponents err in extrapolating from the common interest a

proposed (b)(2) class might have in *litigating a claim to judgment* to the

proposition that a (b)(2) class is appropriate for *settling* a broad and diverse set of

claims.  Litigation that actually tries to stop all the challenged practices holds the

class together and ensures that claims are vindicated by someone who wants to

prove them.  Conversely, when the class bargains—proposing, as part of the

package, to permit defendants' continuing practices or even immunize them from

suit—it becomes essential to preserve class members' right to seek a different

package of relief to protect themselves from individualized harms—most simply,

by preserving their future damages claims.  *See* MA-Br. 36-37, 50-52.

Differences between litigation and settlement also multiply as additional

claims are added to the case.  While all class members may share a common

interest in proving the claims and enjoining *all* the conduct, they likely have

radically different perspectives on how to compromise some claims for others. *See* MA-Br. 51-52; *infra* 19-21. This settlement is an extreme example, because it simultaneously immunizes thousands of pages of different rules with different effects on different members of this 12-million-plus member commercial class.

Accordingly, a class that might be appropriate for (b)(2) *litigation* is not necessarily appropriate for *settlement* without sub-classing, opt-out rights, or other protections. This is hornbook law. The district court must ensure that Rule 23's requirements are met at *all stages* of the case, and the conclusion that the class is appropriate for settlement "will not follow automatically from a finding of adequacy for litigation purposes." *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d 1106, 1124 & n.21 (7th Cir. 1979) (citing Developments in the Law, Class Actions, 89 Harv. L. Rev. 1318, 1537-38 (1976)). Indeed, settlement-class certification requires the greatest scrutiny because it is the last and only chance to enforce the rules protecting absent class members. *See supra* 7-8; *Literary Works*, 654 F.3d at 249.

Even if a proper (b)(2) litigation class were also necessarily an appropriate settlement class, proponents err in suggesting that finality principles from the litigation context allow mandatory settlement classes to bar every claim that would be foreclosed by a classwide judgment in litigation. Objectors' fundamental claim is that they have a due-process right, embodied in Rule 23, to pursue their claims

14

that defendants' conduct harms them.  Perhaps that right could be vindicated by an *actual litigated challenge* to that conduct by an adequate representative—then, perhaps, objectors would have gotten all the process due on their claims, even if they lost.[4]  But, at a minimum, that right is not vindicated when someone else just forces them to give the claims away.  In that case, absent and objecting class members do not get even one chance to show that conduct that harms them is unlawful, and thus to stop it or obtain recompense.

Relatedly, proponents are just wrong about how finality principles apply to future claims of harm.  Future claims based on the same liability theory are foreclosed by *issue preclusion*, not claim preclusion, and issue preclusion is a feature of *litigation*, not settlement.  *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 326-28 (1955).  So even if "a judgment in a properly entertained class action is binding on class members in any subsequent litigation," *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984), that cannot allow class counsel to use a *settlement* to immunize conduct from future claims based on a theory of liability that was *not* pursued to judgment.

---

[4]     Even this contention is problematic when it comes to *damages* claims, for which the Constitution requires a particular process (*i.e.*, jury trials, *see* MA-Br. 43; *Ortiz*, 527 U.S. at 845-46), protected by the right to opt out, *see Dukes*, 131 S. Ct. at 2559.  Thus, even before *Dukes*, courts recognized that mandatory preclusion of such claims could be impossible even through *fully litigated* (b)(2) cases.  *E.g.*, *Jefferson v. Ingersoll Intern. Inc.*, 195 F.3d 894, 898 (7th Cir. 1999).

It is even less appropriate to try to extend the mandatory settlement to every claim that *could* have been brought in the case, no matter how ancillary to the core questions that could have been litigated (but, here, were not). *See* Class-Br. 73; Banks-Br. 47-49. That would be similar to (but even broader than) the scope of *claim* preclusion in *bilateral* litigation. But that doctrine has no application here. Even in bilateral litigation, *claim* preclusion does not apply to future damages claims, and so is irrelevant to the future-looking, mandatory release. *E.g.*, *Lawlor*, 349 U.S. at 327-28. But more important, claim-preclusion rules typically do not apply in the class-action context precisely to protect the individualized claims of absent class members: "Every federal court of appeals that has considered the question has held that a class action seeking *only declaratory or injunctive relief* does not bar subsequent individual suits for damages," in part because "it would offend due process." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114-115 (E.D.N.Y. 2012) (collecting cases).

Briefly put, proponents' invocations of finality rules fail because future claims are only foreclosed when they were actually adjudicated in a previous case. Here, it is precisely that adjudication that objectors are being denied by a mandatory settlement that gives away their claims.

Proponents' conflation of bilateral litigation with class-action settlement leads to head-scratching arguments. For example, they suggest that the Rules

16

Enabling Act must allow them to settle as a mandatory class every claim they could settle as individuals. *See* Class-Br. 45-46. Outside Rule 23, however, proponents would never have the right to settle *other people's* claims, so objectors' interpretation cannot possibly abridge any preexisting right. By contrast, proponents' interpretation *does* violate the Rules Enabling Act by abridging the substantive rights of merchants who are ready and willing to litigate.

Ultimately, the untenable nature of proponents' *res judicata* arguments is best demonstrated by the unprecedented settlement structure they created. Proponents cannot actually assert that the (b)(2) settlement here has issue-preclusive effect—*i.e.*, that the settlement precludes all claims respecting the conduct encompassed by the (b)(2) release—because that would forbid the (b)(3) opt-out litigation. Instead, they assert a bizarre form of partial preclusion under which an opt-out's claims about the unmodified future conduct will be foreclosed by the settlement, but the opt-out can still try to prove that the very same conduct was unlawful in the past. If the opt-out prevails and obtains even a *jury verdict* condemning the conduct, that verdict will not have preclusive effect and defendants will have the right to continue the illegal conduct unabated. Proponents thus give partial issue-preclusive effect to the proceeding that never creates issue preclusion (*i.e.*, settlement), but no issue-preclusive effect to the proceeding that always does (*i.e.*, trial). This is not "ordinary" issue preclusion by any measure. It

17

is one-way *res-non-judicata*, and its sole purpose is to deny class members *any* chance to opt out in a manner that could allow them to stop defendants' conduct by proving it unlawful.

And this is really the point. Proponents candidly admit that what they want "is peace from further challenges to the existing rules of the Visa and MasterCard networks," by anyone (including current and future merchants who cannot opt out) and about virtually anything (including countless rules and practices not challenged or addressed). Banks-Br. 3. This kind of global-resolution argument ultimately seeks legislation by litigation, and has been rejected over and over again in cases like *Amchem*, *Ortiz*, *Literary Works,* and *Authors Guild v. Google, Inc.* ("*Google Books*"), 770 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2011). The core problem is that, no matter how badly defendants want global peace, class-action settlement cannot provide it by extinguishing individualized claims *without opt-out rights*. Otherwise conduct that may violate the law and continue to harm individual class members will be safe from challenge—even by those who want no more than to prevent their own injuries by saving their own claims.

## II.    The (b)(2) Class Is Not Cohesive

Even if a mandatory (b)(2) settlement could extinguish individualized claims, the (b)(2) class also lacked the required cohesion because class members possess disparate interests in the vast array of claims that the settlement extinguished.

Accordingly, class members would have bargained for very different relief if given a seat at the table. When that is so, class members must be able to opt out and seek their own compromise. MA-Br. 48-66.

Proponents respond first by denying that there is a cohesion requirement, then by downplaying its significance, and finally by gesticulating at reasons why class members would benefit from relief that is impossible to use. Class-Br. 31-36; 60-68; Banks-Br. 51-56. All three tactics fail.

## A. Rule 23(b)(2) Requires Cohesion With Respect To All Extinguished Claims.

Class plaintiffs assert that "class 'cohesion' is not expressly required by the text of Rule 23(b)(2) or any Supreme Court precedent interpreting that rule." Class-Br. 31. That artful phrasing avoids Supreme Court authority explaining that "cohesion" is required for any representative litigation, *see Ortiz*, 527 U.S. at 858, *Amchem*, 521 U.S. at 623-24, and this Court's cases acknowledging the cohesion requirement in the (b)(2) context, *e.g.*, *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 165 (2d Cir. 2001). It also ignores that, although the Court in *Dukes* did not use the word "cohesion," it unanimously "highlighted the importance of cohesiveness" in (b)(2) cases, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011), by focusing on the "indivisible nature of the injunctive or declaratory remedy warranted," the fact that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the

class," and the requirement that "the relief sought must perforce affect the entire class at once," *Dukes*, 131 S. Ct. at 2557-58.

Proponents seek an upside-down world in which cohesion is hard to show for opt-out, (b)(3) classes, but somehow "presumed" in the mandatory, (b)(2) context. Class-Br. 31. Leave aside the recent Supreme Court holding that "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton v. Erica P. John Fund*, 134 S. Ct. 2398, 2412 (2014). Leave aside, also, that cases from this Circuit and others have recognized that the cohesion requirement is *more* exacting in the (b)(2) context, precisely because opt-out rights are absent. *See* MA-Br. 49 (collecting cases). Proponents' "presumption" is no more than another attempt to focus the Court on how the class framed its complaint "at its option," rather than the real interests of class members in the claims that are precluded by the action, as *Dukes* requires. 131 S. Ct. at 2559.

The sources that proponents suggest for their rule are thus inapposite. Proponents say it is appropriate to focus the cohesion analysis on the claims originally asserted, rather than the claims precluded and relief obtained, because *Amchem* and *Ortiz* teach that cohesion analysis "must focus on questions that preexist any settlement." *Ortiz*, 527 U.S. at 858; Class-Br. 35; Banks-Br. 52-53. This is ironic, because proponents' entire cohesion argument boils down to the

assertion that the whole class is getting the same thing in the settlement. *See* Class-Br. 33; MA-Br. 59, 64; *infra* 24-25.  In fact, *Ortiz* held that cohesion could not be *created* by the common interest in settlement; it did not suggest that a settlement that resolved disparate claims or granted disparate relief would not undermine cohesion.  Quite the contrary:  *Ortiz* held that disparate treatment of claimants under a mandatory settlement demonstrated *non*-cohesion.  *Id.* at 857. As the Advisory Committee Notes to the 2003 Amendments to Rule 23 make clear, "[t]he terms of the settlement themselves, or objections, may reveal divergent interests of class members."

Proponents' rule lacks any contemporary support.  Objectors' brief pointed to several post-*Dukes* cases invalidating (b)(2) classes as non-cohesive because they sought or obtained injunctive relief that was not commonly available or valuable to the class.  Proponents dismiss these as a "smattering of decisions from other jurisdictions," Class-Br. 32, but they represent the weight of post-*Dukes* authority and uniformly hold that (b)(2) certification is inappropriate if the class will not receive a common, indivisible benefit from the injunctive relief, *see* MA-Br. 50 (collecting cases), *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th

Cir. 2012). Proponents cite no contrary post-*Dukes* authority; [5] their backhanded dismissal is simply a casual invitation for this Court to isolate itself in a circuit split.

**B.      As State-Law Surcharging Bans Demonstrate, The (b)(2) Class Is Non-Cohesive.**

Here, the (b)(2) settlement's release sweeps defendants' entire rulebooks into the case, making cohesion impossible. Notably absent from proponents' briefs is any case certifying a class of millions of members to challenge thousands of distinct practices at once—in the settlement context or otherwise. There is no such case for good reason: The broader the scope of the precluded claims, the less likely that a (b)(2) settlement class could have a cohesive, indivisible interest in how they *all* get resolved. Accordingly, cohesion is not established simply because defendants' rules apply nationally. Class-Br. 29-34; Banks-Br. 54-55. A class of all merchants challenging all of defendants' bankcard practices is much like a class of all female Wal-Mart employees challenging all aspects of Wal-Mart's employment practices—one that the Supreme Court held to fail even the minimum commonality requirement of Rule 23(a), *see Dukes*, 131 S. Ct. at 2557, let alone the *far* higher cohesion standard of Rule 23(b)(2).

---

[5]      Proponents reach back to a passage from the pre-*Dukes*, fourth edition of the Newberg class-action treatise, Class-Br. 34, which in turn relies on a single case from 1975, *see* 2 *Newberg* §6:15, at 624 (4th ed. 2002). The quoted language does not appear in the fifth edition, which addresses (b)(2) cohesion through the lens of cases like *Dukes*. *See* 2 *Newberg* §4:32-34, at 115-23 (5th ed. 2012).

The most glaring evidence of non-cohesion, however, is that many class members reside in states where surcharging—the settlement's core relief—is against the law.  Proponents thus cannot possibly carry their affirmative burden of showing that surcharging would "provide relief to each member of the class."  *Id.* at 2557.  This, again, is for just one core consequence of the settlement—without regard to the divergent interests of the millions of class members in the thousands of other practices it immunizes.

Proponents' responses to class members' preexisting differences are transparently inadequate.  For example, proponents treat the unique concerns of the billion-dollar health-insurance industry as a footnote-level sideshow, while the district court acknowledged that the negotiators never even considered such class members.  SPA48; Class-Br. 34 n.4.  It is illustrative that proponents—who supposedly *represent* these (b)(2) class members—care nothing for their individual issues.  *See* WellPoint/Blue Cross's Reply __.  Meanwhile, newly founded and growing merchants likewise have predominating interests in future-looking relief, and different industries face very different circumstances when it comes to using the handful of changes the (b)(2) class secured.  MA-Br. 52-62.  This is exactly why individual class members needed the right to opt out and seek individualized relief for themselves.

Proponents' efforts to downplay state-law discrepancies have even less substance. This is not an instance where some class members cannot take "full advantage" of a remedy, Class-Br. 34, 64-66, or do not "benefit equally" from the settlement relief, Banks-Br. 55. Here, class members in ten states are barred, *by law*, from surcharging *at all*—a fact highlighted by the recent decision upholding Florida's *criminal* surcharging ban. *See Dana's R.R. Supply v. Bondi*, No. 14-134 (N.D. Fla. Sept. 2, 2014), Dkt. 29. Precedent unambiguously requires attention to state-law differences in assessing settlement cohesion. *In re AIG Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012); MA-Br. 57. Such discrepancies cannot be brushed aside.

Indeed, the arguments necessary to defend this class are quite telling. For example, proponents suggest that the whole class benefits in common because even merchants in no-surcharging states now face only one barrier to surcharging instead of two. Class-Br. 64-65. That is true only in the same sense that providing a stepstool in a voting booth would eliminate one of two barriers facing small children who want to cast a ballot. Whatever else changes, it remains *against the law*. Defending the relief granted to a cohesive class would not require such sophistry.

These anti-surcharging laws demonstrate that proponents cannot satisfy even their own emaciated version of the cohesion requirement, which would require no

more than that all class members share the same "elements" for their injunctive claims. Class-Br. 32-33. Class members in no-surcharging states lack standing to even seek an injunction against anti-surcharging rules because they cannot show that such rules would likely be applied to them. *E.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 106-07 & n.7 (1983) (standing for injunction requires facing "a realistic threat from the future application of the [challenged] policy").

Proponents also err in minimizing these and other barriers to surcharging (such as the AmEx rules) as "independent obstacles" that somehow lack significance because they were outside the settlement's control. Class-Br. 34, 63-65. Individuals negotiate for results that benefit them in fact; what proponents denigrate as "independent" circumstances, class members call "the real world." If real-world facts like state law mean that the injunction will not, in fact, benefit the entire class at once, *Dukes*'s cohesion standard simply cannot be met. Indeed, that such facts lie beyond the settlement's control is exactly what makes the class non-cohesive when it comes to bargaining about what the settlement can change. *See Ortiz*, 527 U.S. at 858 (cohesion must focus on the interests that preexist the settlement).

### C. The Settlement Relief Is Divisible.

Finally, proponents' suggestion that the settlement provides "indivisible" injunctive relief—in the sense that opt-outs would necessarily and unfairly benefit from rule changes, *see* Class-Br. 36, Banks-Br. 54-56, 59—is simply false.

There is nothing about the bankcard industry in general, or surcharging in particular, that prevents surcharging from being available only to non-opt-outs. This is not structural relief that will "perforce" affect all class members—like desegregating a school—but rather an individualized rule that can be applied (or not) to merchants of defendants' choosing. Indeed, both defendants already have rules applying surcharging only to certain merchants: Universities and government entities may impose "convenience fees," while most merchants cannot. JA[__].

In fact, the divisibility of surcharging is confirmed not only by defendants' rulebooks, but the settlement itself, in which defendants reserve the right to negotiate around the surcharging relief with individual class members. MA-Br. 61-62. A form of relief amenable to individualized bargaining after the fact is also obviously amenable to such bargaining before the fact. Accordingly, an "indivisible" injunction was neither required nor actually provided by the settlement, which fails *Dukes*'s standard for that reason as well.

### III.   One Set Of Lawyers And Class Representatives Could Not Adequately Represent Both Classes

Even if proponents could bring together a cohesive (b)(2) class, and address the presence of damages claims by certifying a separately defined (b)(3) class, precedent unambiguously required providing those classes with separate representation.  *See* MA-Br. 71-74.  This is not controversial:  Over 20 years ago, this Court held that separate classes "cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups."  *In re Joint E. and S. Dist. Asbestos Litig*., 982 F.2d 721, 743 (2d Cir. 1992).  The Supreme Court adopted that proposition to the letter in *Amchem*, 521 U.S. at 627, and this Court stringently applied it on all-but-identical facts in *Literary Works* only three years ago.  *See* 654 F.3d at 253.

Proponents' attempts to distinguish these cases—particularly *Literary Works*—are illustrative efforts to limit them to their facts.  Class-Br. 51-52.  But what proponents omit is more striking still.  While claiming that "(b)(2) and (b)(3) have peacefully co-existed for decades, and litigants routinely combine them," *id.* 53, proponents point to no case where a court considered and approved of having the same counsel and representatives simultaneously negotiate and agree to a settlement on behalf of separately defined and differently populated (b)(2) and (b)(3) classes—especially over the objection of (b)(2) class members who seek

27

only to preserve their individual claims. The arguments proponents do make, meanwhile, are squarely foreclosed.

### A. Third-Party Supervision Does Not Substitute For Independent Representation.

Proponents first appeal to the respected mediators who supervised the settlement. Class-Br. 47-50. This is irrelevant. Mediators can help ensure arm's-length negotiations between plaintiffs and defendants. But the problem here was between *the classes*: (b)(3) monetary relief could be traded for limitations on the going-forward changes defendants would make and the future litigation risk they would face from (b)(2) class members that could not opt out to protect themselves. Mediators *mediate*, and so are attuned to areas of dispute between the parties. They cannot be expected to police class counsel's representation, especially where it would require adding further areas of dispute.

Moreover, it should not be necessary to waste words rebutting an argument so directly contrary to precedent. *Literary Works* rejected a settlement process overseen by one of the nation's most respected mediators. 654 F.3d at 253. That process was equally "intense, protracted, [and] adversarial." *Id.* at 252. Yet the Court expressly held that "participation of impartial mediators … does not compensate for the absence of independent representation" because "no one advanced the strongest arguments in favor of [each group's] recovery." *Id.* at 253. Proponents' lead arguments to the contrary are drawn, essentially unaltered, from

the *Literary Works* dissent.  *Compare* Class-Br. 47-52 *with* 654 F.3d at 263 (Straub, J., dissenting).

Nor does the process of this settlement actually compare favorably to *Literary Works*.  There, "associational plaintiffs" supported the settlement and "advanced the interest of all authors, the largest contingent of which" were the allegedly underrepresented "Category C-only plaintiffs."  654 F.3d at 252.  Even that was deemed insufficient.  *Id.* at 253 ("[I]nstitutional plaintiffs do[] not compensate for the absence of independent representation.").  But here, the institutional plaintiffs most focused on the under-represented (b)(2) class *voted against the settlement*, at which point they were dropped as class representatives.  If unitary representatives approving a settlement on behalf of separately defined classes is a "red flag," *Eubank v. Pella*, 753 F.3d 718, 721 (7th Cir. 2014), doing so over the objection of all six institutional representatives is a six-alarm siren.

## B.     Classes With Overlapping Membership Still Require Independent Representation.

Proponents next argue that common representatives sufficed for both classes because of largely overlapping membership.  This argument is both factually unsound and again foreclosed by *Literary Works*.

Ironically, proponents first suggest that the two classes *they created and defined separately* to pursue separate interests did not need separate representation because they "are not subgroups at all," but instead "largely one and the same

group." Class-Br. 51. This argument is proof positive that something is amiss. If plaintiffs intended to represent one class simultaneously seeking injunctive relief and billions in damages, the solution was unambiguous. As in *Visa Check*, they could and should have sought certification for their one class under Rule 23(b)(3), which makes both kinds of relief available. *See* 280 F.3d at 147. Although proponents constantly insinuate that the rules committee made them do it, *e.g.*, Class-Br. 53 ("They exist as two 'classes' … by virtue of Rule 23(b)."), nothing required the certification of a separate (b)(2) class here—other than proponents' desire to extinguish opt-out rights.

Proponents' slanted representational priorities also cause them to miss the massive non-overlap that *they created*. Class-Br. 51. Objectors' opening brief explained that there are "tens of thousands of now-defunct merchants belonging only to the (b)(3) class," and "millions" of future merchants and opt-outs belonging only to the (b)(2) class. MA-Br. 75-78 & n.13. Proponents do not even try to contest this reality.

That is because it is incontestable. The (b)(3) opt-outs alone accept over 25% of defendants' transaction volume—a remarkable divergence by any yardstick. Meanwhile, the future-merchant class whose claims are extinguished is, *by itself*, larger than almost any class in history. In about 10 years between this case and *Visa Check*, the merchant class more than doubled (from about five to 12 million

members).  *See Wal-Mart Stores v. Visa U.S.A.*, 396 F.3d 96, 100 (2d Cir. 2005);

SPA6.  So, in the next ten years alone, the non-overlapping set of future merchants

whose rights have been extinguished by proponents' decision to certify a separate

(b)(2) class may already be larger than any overlap.

    That proponents do not even recognize these interests demonstrates the very

problem at issue.  Class counsel remain overwhelmingly focused on overlapping

merchants who *will* receive their share of a multi-billion-dollar fund as part of the

price for the (b)(2) release—perhaps because they have their own stakes in that

fund.  Representatives "who understand that their role is to represent solely the

members" of the (b)(2) class could not possibly miss that it encompasses *many*

*millions* who do not share the (b)(3) class's interest in monetary relief.  *Amchem*,

521 U.S. at 627.

    *Amchem* and *Ortiz* both warn that allowing a single set of representatives to

dispose of both present and future claims is an "egregious" conflict.  MA-Br. 72-73.

Proponents try to distinguish these cases by arguing that the classes there were

"mutually exclusive," Class-Br. 51-52, but *Literary Works* already considered and

rejected this very argument.  After noting that the subgroups in *Amchem* and *Ortiz*

were "mutually exclusive," 654 F.3d at 251, *Literary Works* held that the overlap

in that case did not ameliorate the sub-classing problem and, if anything, might

exacerbate it.  *See id.* at 257 (noting that "as many as seven subclasses" might be

necessary to deal with overlaps among A, B, and C claims).  The one thing *Literary Works* absolutely required was giving each separately defined class *of relief* its own independent champion in negotiations—which would maximize recovery for all classes, and ensure adequate representation for overlapping and non-overlapping members alike.  *Id.*  What it absolutely prohibited was for class members with multiple kinds of claims to represent those who held only one— exactly the structure proponents adopted.

### C.     The Trade-Offs Between Prospective And Monetary Relief Are Obvious.

Proponents suggest, in passing, that objectors merely "imagine tradeoffs here between retrospective damages and prospective injunctive relief," and that the conflicts between the classes are not fundamental.  Class-Br. 50, 52.  It's not clear this matters:  Proponents *themselves* decided that separate classes were necessary, and as both this Court and the Supreme Court have said, "where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement … on the basis of consents by members of a unitary class."  *Amchem*, 521 U.S. at 627.  Apparently, proponents are likewise unaware of any authority, because they offer none.

In any event, the tensions between the (b)(2) and (b)(3) classes are palpable.  Proponents acknowledged that they could not reach a monetary settlement without disposing of all future claims, and that the (b)(2) release was "a breathtaking

32

success for the bankcard industry" that would "end [its] antitrust wars for years to come." MA-Br. 69. As a matter of simple logic, it is evident that a broader release would (and did) fetch a higher monetary price. MA-Br. 71.

Indeed, proponents' briefs (unwittingly) confirm that the claim-trading risk was very real. They argue that "separate representation" would have made "simultaneous settlements of damages and injunctive relief claims virtually impossible." Class-Br. 51. They do not say why. Of course, a simultaneous settlement would be quite likely if both classes were getting good deals. The only reason settlement becomes harder with separate representatives is the barrier to trading claims.

Moreover, this argument spits into the wind of reality. After this Court required separate representation for the Category-C-only claimants in *Literary Works*, the case still settled. All that changed was that defendants agreed to more favorable terms, with much better relief for the Category-C claimants. *See* http://goo.gl/fcw76c. Judicial experience confirms that separate representation prevents abuse, not settlement.

Proponents also claim that it is "perverse" that a greater monetary achievement would lead to greater questions about their representation. Class-Br. 55. But that's only perverse if one ignores the *non*-monetary interests of the (b)(2) class. As a matter of counsel's incentive structure, this case is identical to *Ortiz*,

33

where a huge recovery for one class and its attorneys (here, the (b)(3) class) was contingent on those same lawyers getting another mandatory class to go along (here, the (b)(2) class). The Supreme Court condemned exactly that incentive structure, partly because "the potential for gigantic fees" undermined the representation. 527 U.S. at 852. There is nothing "perverse" in the Supreme Court's rationale.

Finally, proponents urge that neither the district court nor this Court need separately consider the fairness of the (b)(2) and (b)(3) settlements, suggesting instead that they should be reviewed as a whole. Class-Br. 57-59. That they urge this balancing is strong evidence that they impermissibly employed it themselves, potentially allowing billions of dollars in (b)(3) gain to balance out the (b)(2) class's sacrifice. *In proponents' own words*: "there is simply no brushing aside the 'massive damages fund'" in assessing the settlement. *Id.* at 59. Imagined tradeoffs indeed.

Proponents make their sole effort to distinguish *Literary Works* on this front, Class-Br. 52, arguing that the conflict there was more fundamental because the relief for the A, B, and C groups was capped, so that more relief for A and B led to less for C. But that was a feature of the settlement *ex post*, not of the relationship between the claimants that necessitated separate representation *ex ante*. Put otherwise, the cap in *Literary Works* was *evidence* of inadequate representation,

34

not its *cause*.  The structural deficiency inhered, instead, in different groups

seeking different sets of relief from the same defendants without independent

representation, 654 F.3d at 251-55—exactly the structure created here.

Nor can defendants seriously suggest that the actual results of this settlement

display no evidence of tradeoffs.  The (b)(3) class received a "historic" sum, Class-

Br. 57; the (b)(2) class received relief that many members cannot use because,

*inter alia*, it's a crime.[6]  And the possible selling out of the (b)(2) class only

becomes more obvious when one recognizes that the *only* reason to separately

certify it was to mandatorily give away its members' individualized claims.  Had

there been class counsel with the interests of (b)(2) class member at heart, they

could have gotten them the same relief as part of the (b)(3) class while preserving

their right to choose.  *Supra*, 29.

Proponents miss the dual-representation problem because—here as

elsewhere—they elide the critical distinction between class-action litigation and

settlement.  They suppose that this structural conflict is inconsistent with

"decades" of cases combining (b)(2) and (b)(3) certification.  Class-Br. 37-38, 53.

But every case they cite in this regard involves *litigation* classes.

Proponents rely principally on two post-*Dukes* appellate cases:  *Gooch v.*

*Life Investors Insurance Co.*, 672 F.3d 402, 427-29 (6th Cir. 2012), and *Johnson v.*

---

[6]     Objectors join the arguments of the Merchant Trade Groups' Reply ("MTG
Reply") __, which discusses this discrepancy at length.

35

*Meriter Health Plan*, 702 F.3d 364, 371 (7th Cir. 2012).  Class-Br. 38; Banks-Br.

62.  Both approve a (b)(2) class for *litigating liability*, to be followed, only perhaps,

by a (b)(3) class seeking damages if liability is established.  No conflict arises in

that context because, before damages can be sought for anyone, class counsel must

establish maximum liability for the (b)(2) class's benefit.  Conversely, it is the

bargaining inherent in simultaneous settlement, and the prospect of obtaining

money *without* establishing liability, that allows (b)(2) claims to be traded for (b)(3)

cash.  *Supra*, 13-14.  That's especially so where—unlike in proponents' cases—

many practices are at issue, and the settling parties can shift the set of changed and

forever-immunized conduct so that defendants get what they pay for.

     This important distinction is evident in the very district court cases that

defendants cite, but do not discuss.  Class-Br. 38.  For example, in *Vitamin C*, 279

F.R.D. at 113-14, Judge Cogan permitted dual representation *only* for purposes of

litigation.  Citing circuit precedent, he recognized the possibility of a conflict

where damages or settlement was at issue, and permitted certification contingent

on his power to "revisit the issue and de-certify the class if a true conflict ever

manifested."  *Id.*; *see Seijas v. Argentina*, 606 F.3d 53, 57 (2d Cir. 2010) (noting

serious potential conflict with attorneys' multiple representation "would threaten

the damages phase of the proceedings, not the liability phase" and allowing

certification because "the district court will continue to be alert to this issue in the course of subsequent proceedings."); *see also supra*, 14.

As to actual consideration of settlement dynamics, Judge Motz's decision in the *Microsoft* litigation is precisely on point. There, the same counsel sought to represent both a monetary and injunctive class in a case that involved multiple kinds of conduct and a potential nationwide injunctive class. As the court explained: "At least some members of the monetary damages class might, as events unfold, be interested in a compromise resolution that would be acceptable to Microsoft while the injunctive class might contain members who would be willing to accept nothing less than a full range of conduct remedies that Microsoft would vigorously contest." *In re Microsoft Corp. Antitrust Litig.*, 214 F.R.D. 371, 379 (D. Md. 2003). The court thus found dual representation inadequate, in reasoning that applies to this case word for word. *Id.*

Ultimately, every case that emphasizes the problem of overlapping representation—*Amchem*, *Ortiz*, *Literary Works*, *Joint Asbestos Litigation*—is a settlement case. And each makes absolutely clear that separate classes of claims *bargaining* for separate classes of relief from the same defendants require separate representation. This negotiation had none.

## IV.  The (b)(2) Release Exceeds Its Permissible Scope

Objectors' opening brief explained that, quite apart from the violations above, the terms of the (b)(2) release violate independent doctrines governing prospective antitrust immunity and class-action releases.  MA-Br. 80-90. Proponents attempt to escape these doctrines by muddling them together and minimizing the most extreme facts.  The reality is that the (b)(2) release here extends far beyond the permissible effects of any class-action release.

### A.  The Release Impermissibly Waives Future Antitrust Claims.

Proponents offer essentially no response to the cases holding that parties cannot release antitrust liability for future conduct as a matter of public policy. MA-Br. 80-82.  Instead, they obfuscate by folding this issue into a broader discussion about when (opt-out) class-action settlements can release future-conduct claims in *non*-antitrust cases.  Banks-Br. 70-71; Class-Br. 76.

As this Court has noted, however, the rule against waiving future *antitrust* claims is a product of the unique "private attorney general" policy of the Sherman Act.  *See* MA-Br. 80-82.  In antitrust, threats of future private enforcement are essential to obtaining the nationwide benefits of competition down to the end-consumer level.  That policy is so important that this doctrine applies even to *private bilateral agreements*; it amplifies exponentially where, as here, a mandatory release of all possible claims is at issue.  Simply put, proponents cannot

38

contest that the very thing the (b)(2) release endeavors to achieve is something this Court and the Supreme Court have held to be contrary to federal antitrust policy.

All proponents can do is misstate the facts of *Lawlor*—which, in any event, is hardly the only case holding that private agreements to release future antitrust claims are contrary to public policy. MA-Br. 81. Proponents say invoking *Lawlor* is "disingenuous" because it is about immunity for "*new allegedly anticompetitive conduct* that could not have been the subject of the previous suit," rather than future claims based on "substantially similar" conduct like those at issue here. Banks-Br. 70-71. But far from being disingenuous, it is only objectors' description of *Lawlor* that faithfully reflects its facts. The whole issue in *Lawlor* was whether a plaintiff could assert an antitrust claim based on new conduct that was substantially the same as settled conduct. And the Court held that, while "both suits involved 'essentially the same course of wrongful conduct,'" the later-arising claims could not be barred as a matter of both claim preclusion and public policy, even for the very party that settled the first case. 349 U.S. at 327-29.

To the extent proponents cite other cases about future-looking releases of *antitrust* claims, those cases go against them. For example, proponents cite *Schwartz*, Class-Br. 76 n.13, but fail to note that the settlement there was revised to comply with the court's prior holding that "the releases [we]re too broad" because "class members would be releasing unlitigated future claims" and "public policy

prohibits a release from waiving claims for future violations of antitrust laws."

*Schwartz v. Dallas Cowboys Football Club*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001).

### B. The Release Otherwise Exceeds The Court's Power.

Even outside special antitrust concerns, the release goes well beyond the permissible scope of class-action litigation, because it releases both claims that are unripe and claims that lie far beyond the facts at issue. MA-Br. 82-90. Proponents respond by arguing that the release goes no further than the "ordinary" effects of *res judicata* in a litigated case. Class-Br. 75-76; Banks-Br. 47-49. But as objectors explain above, *supra*, 14-17, and the associational objectors also explain at length, *see* MTG Reply __, proponents have vastly overstated how *res judicata* works in general and in the special sphere of class-action settlement.

The reality is that no cases have ever approved a release with such broad forward-looking language, and proponents' invitation to do so now because a subsequent court can disregard it later is both an inversion of established precedent and an invitation to mischief. Accordingly, a few particularly important facts about the scope of the release bear special mention.

First, proponents spend considerable ink defending the release of future claims about the conduct at the heart of the complaints (*i.e.* Honor-All-Cards, default interchange, and anti-steering rules). But they ignore that the (b)(2) release

extends much further, reaching future claims about the present *rules* even if those rules are enforced in very different factual contexts that result in different anticompetitive *effects*. For example, proponents do not dispute that the release will enable defendants to apply their existing rules to future technologies, like mobile payments, that actually have the capacity to unleash new competition in this intractably concentrated market. Banks-Br. 69-70 (release will apply unless they adopt "entirely new" rules). It is the forward-looking release of this *unknown* future conduct that poses an extreme danger to class members, and which is accordingly forbidden—particularly where class members lack opt-out rights. MA-Br. 84-87 & n.15 (discussing caselaw and scholarship regarding the dangers of forward-looking, class-action conduct releases).

It is thus not at all clear what proponents mean when they argue that such "future claims," based on future rules or conduct, "could have been alleged" in this case. Class-Br. 76. The release covers claims about "conduct" that has not yet occurred, with unknown future effects. Given that rule-of-reason antitrust challenges depend entirely on those effects, these are textbook examples of "claims which did not … exist and which could not possibly have been sued upon in the previous case," and so cannot be extinguished. *Lawlor*, 349 U.S. at 328.

Second, when it comes to present claims beyond the case's *factual* scope, proponents attempt to turn this Court's "identical factual predicate" doctrine into

41

the "remotely-similar-factual predicate doctrine."  Class-Br. 73; Banks-Br. 67.

However broadly the term might be stretched, there is no case for the proposition

that the "identical" predicate includes *all the things defendants currently do*.  And

that is exactly how far this release extends—capturing every rule in defendants'

deforesting rulebooks, plus a host of unwritten policies and practices.  MA-Br. 87-

90.

Proponents attempt to obscure this reality by focusing their discussion on the

core claims like default interchange—which are within the factual predicates of

this case.  Class-Br. 74; Banks-Br. 69.  But there is no dispute that they extended

the release far beyond that, including even rules like the FANF, which were

enacted after fact discovery had closed.

Proponents argue that complaints about the FANF could nonetheless have

been litigated because it was in place prior to the settlement.  Banks-Br. 69 n.21.

That suggested rule is breathtaking:  Not only can class-action settlements now

release future claims that were not litigated, and claims unrelated to the complaint

that could have been brought, they can also release claims that could have been

alleged in a new complaint right up to settlement day.[7]  This is a broader version of

claim preclusion than has ever been applied in bilateral litigation, and has no

precedent whatsoever in the class-action context.

---

[7]    Proponents falsely claim that this FANF argument was only raised in a
footnote below.  *But see* JA[__] (full-text argument).

Finally, proponents seek to table these points, arguing that a future court can apply due-process principles and the identical factual predicate doctrine down the road to determine the scope of defendants' immunity from suit. *E.g.*, Banks-Br. 71. *National Super Spuds v. N.Y. Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) forecloses this argument. There, Judge Friendly explained that "[t]he only plausible basis on which a [future] court could hold that the language did not have its intended and clearly stated effect would be if it found the district court had no power to approve [such] a settlement." *Id.* at 16. If such a determination must be made, the Court held, it should be in the current case, not at a remove from the present litigation. *Id.* Otherwise, as defendants undoubtedly anticipate, future courts will defer to the express language of the release and improperly bar claims well beyond the power of the prior suit.

Ultimately, defendants' attempt to immunize their current business model through a class-action settlement goes far beyond any known form of federal litigation. What it closely resembles, however, is the disapproved settlement in *Google Books*, which Judge Chin found "[was] an attempt to use the class action mechanism to implement forward-looking business arrangements that go far beyond the dispute before the Court in this litigation." 770 F. Supp. 2d at 677. If the settlement is left undisturbed, defendants will have achieved—in negotiations with class counsel bearing a monetary interest in the settlement—what will be, in

43

effect, a legislative solution that virtually immunizes their way of doing business from any future challenge.  That might be appropriate for Congress; it is not a proper use of the federal courts.

## CONCLUSION

The judgment should be reversed.

Dated:  New York, New York
        November 25, 2014

Respectfully submitted,

/s/ Thomas C. Goldstein

Stephen R. Neuwirth[*]              Thomas C. Goldstein[*†‡]
Sanford I. Weisburst              Eric F. Citron
Steig D. Olson                    GOLDSTEIN & RUSSELL, P.C.
QUINN EMANUEL URQUHART &          5225 Wisconsin Avenue, N.W.
  SULLIVAN, LLP                   Suite 404
51 Madison Avenue, 22nd Floor     Washington, D.C.  20015
New York, NY  10010

Jeffrey I. Shinder[†]              Michael J. Canter[‡]
Gary J. Malone                    Robert N. Webner
A. Owen Glist                     Kenneth J. Rubin
CONSTANTINE CANNON LLP            VORYS, SATER, SEYMOUR
335 Madison Avenue, 9th Floor       AND PEASE LLP
New York, NY  10017               52 East Gay Street
                                  Columbus, OH  43215

                                  Gregory A. Clarick[‡]
                                  CLARICK GUERON REISBAUM LLP
                                  220 Fifth Avenue, 14th Floor
                                  New York, NY  10001

*(Parties listed on following pages.)*

[*]*Attorneys for Objector-Appellant Home Depot U.S.A., Inc.*

[†]*Attorneys for Plaintiffs-Appellants*

*Coburn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC; Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience Stores; National Community Pharmacists Association; National Cooperative Grocers Association (NCGA); National Grocers Association; National Restaurant Association; and NATSO Inc.;*

*And for Objectors-Appellants*

*7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors; Aldo US Inc. d/b/a Aldo and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.; American Eagle Outfitters, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Best Buy Stores, L.P.; BJ's Wholesale Club, Inc.; The William Carter Company (Carter's); Costco Wholesale Corporation; Crate & Barrel Holdings, Inc.; Darden Restaurants, Inc.; David's Bridal, Inc., DBD Inc. and David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.; Dillard's, Inc.; Family Dollar Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.; Gap Inc.; GNC Holdings, Inc. (General Nutrition Corporation); Genesco Inc.; The Gymboree Corporation; HMSHost Corporation; IKEA North America Services, LLC; J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon Petroleum LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; National Railroad Passenger Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant Group, Inc.; Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal Supplies, Inc.; PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI); Roundy's Supermarkets, Inc. d/b/a Pick 'N Save, Rainbow, Copps, Metro Market and Mariano's; Sears Holdings Corporation; Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Thermo Fisher Scientific Inc.; The Wendy's Company; The Wet Seal, Inc.; Whole Foods Market, Inc.; Zappos.com, Inc.; Fleet Wholesale Supply Co., Inc.; Mills Motor, Inc.; Mills Auto Enterprises, Inc.; Willmar Motors, LLC; Mills Auto Center, Inc.; Fleet and Farm of Alexandria, Inc.; Fleet Wholesale Supply of Fergus Falls, Inc.; Fleet and Farm of Green Bay, Inc.; Fleet and Farm of Menomonie, Inc.; Mills Fleet Farm, Inc.; Fleet and Farm of Manitowoc, Inc.; Fleet and Farm of Plymouth, Inc.; Fleet and Farm Supply Company of West Bend, Inc.; Fleet and Farm of Waupaca, Inc.; Mills E-Commerce Enterprises, Inc.; Brainerd Lively Auto, LLC; Ashley Furniture Industries Inc.; Beall's, Inc.; Boscov's, Inc.; The Buckle, Inc.; Buc-ee's Ltd.; The Children's Place Retail Stores, Inc.; Cracker Barrel Old Country Store, Inc.; Cumberland Farms, Inc.; Express, LLC; Family Express Corporation; New York & Company, Inc.; Republic Services, Inc.; Swarovski U.S. Holding Limited; and The Talbots, Inc.*

[‡]*Attorneys for Objectors-Appellants*

*Target Corporation; Macy's, Inc.; Kohl's Corporation; The TJX Companies, Inc.; Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.; Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.; Ascena Retail Group, Inc.; Abercrombie & Fitch Co.; OfficeMax Incorporated; Saks Incorporated; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.; Luxottica U.S. Holdings Corp. and American Signature, Inc.*

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with this Court's order dated October 20, 2014 (ECF No. 1128), granting leave to file an oversized brief, because it contains 9,992 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated: November 25, 2014                    <u>/s/ Thomas C. Goldstein</u>